UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| STEVEN Z. JURISTA, as<br>Disbursing Agent under First<br>Amended Liquidating Plan of<br>Reorganization of Jermax, Inc.<br>d/b/a Gulf & Northern Trading<br>Corporation, | : | |
| | : | Civ. No.12-3825 (NLH/JS) |
| Plaintiff, | : | |
| v. | : | |
| | : | OPINION |
| AMERINOX PROCESSING, INC.,<br>ROBERT CARTER, SETH YOUNG,<br>ARTHUR GERWITZ, and GENERAL<br>ELECTRIC CAPITAL CORPORATION | : | |
| Defendants. | : | |

APPEARANCES:

LEONARD C. WALCZYK, ESQUIRE
WASSERMAN, JURISTA & STOLZ, P.C.
225 MILLBURN AVENUE
SUITE 207
MILLBURN, NJ 07041
    *Attorney for Plaintiff Steven Z. Jurista, as Disbursing
    Agent for Jermax, Inc., d/b/a Gulf & Northern Trading
    Corporation,*

RONALD L. GLICK, ESQUIRE
STEVENS & LEE
PRINCETON PIKE CORPORATE CENTER
100 LENOX DRIVE
SUITE 200
LAWRENCEVILLE, NJ 08648
    *Attorney for Defendant Amerinox Processing, Inc.,*

JOHN VENA FIORELLA, ESQUIRE
ARCHER & GREINER, PC
ONE CENTENNIAL SQUARE
EAST EUCLID AVENUE
HADDONFIELD, NJ 08033
     *Attorney for Defendants Robert Carter and Seth Young,*

EVAN A. BLAKER, ESQUIRE
BYLER & BLAKER, LLC
CHERRY HILL PLAZA
1415 ROUTE 70 EAST
SUITE 407
CHERRY HILL, NJ 08034
     *Attorney for Defendant Arthur Gerwitz,*

LISA S. BONSALL, ESQUIRE
McCARTER & ENGLISH, LLP
FOUR GATEWAY CENTER
100 MULBERRY STREET
PO BOX 652
NEWARK, NJ 07102-0652
     *Attorney    for    Defendant    General    Electrical    Capital
     Corporation.*

**TABLE OF CONTENTS**

I.    Factual Background and Procedural History.................................... 5

II.   Standing...................................................................... 13

      A. Constitutional Standing.............................................. 14

      B. Prudential Standing.................................................. 17

      C. *In Pari Delicto* Defense............................................ 23

III.  The Motion to Strike ........................................................ 34

      A. Standard of Law Under Rule 12(f).................................... 34

      B. Discussion of the Motion to Strike ................................. 36

IV.   The Motion to Dismiss........................................................ 43

      A. Standard of Law Under Rule 12(b)(6)................................. 44

      B. Discussion of the Motion to Dismiss................................. 47

1. The Fraud Claims................................................................ 47

    i.    Counts 1 and 8: Avoidance and Recovery of Fraudulent Transfers under 11 U.S.C. § 548(a)(2) ........................................................ 49

    ii.   Counts 2, 4, 9 and 11: Avoidance and Recovery of Fraudulent Transfers under N.J.S.A. §§ 25:2-25(a)(b) and 25:2-27 (a)(b) ............................... 51

    iii. Counts 3 and 10: Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1) ........................................................ 60

2. Count 5: Conversion................................................ 67

3. Count 6: Unjust Enrichment.................................... 68

4. Count 7: Turnover under 11 U.S.C. § 542................ 72

5. Count 13: Breach of the Implied Covenant of Good Faith and Fair Dealing ........................................ 74

6. Count 14: Breaches of Fiduciary Duties.................. 80

    i.    Fiduciary Duty of Care................................ 84

    ii.   Fiduciary Duty of Loyalty and Good Faith........ 87

7. Counts 15, 16, 21 and 22: The Aiding and Abetting Claims................................................................ 90

8. Count 17: Successor Liability................................ 98

9. Count 18: Piercing the Corporate Veil.................... 103

10. Count 19: Misappropriation of Assets, Trade Secrets, Proprietary Information and Other Assets................ 110

11. Count 20: Constructive Trust................................ 114

12. Count 23: Avoidance of Post-Petition Transfers........... 116

13. Count 24: Avoidance and Recovery of Transfers to Mediate and Immediate Transferees............................ 119

V.    The Cross-Motion for Imposition of Prejudgment Temporary Restraints Against Transfers by Defendants Amerinox, Carter, Young, and Gerwitz............................................ 126

    A. Likelihood of Success on the Merits .................... 129

    B. Irreparable Harm............................................ 136

C. Balance of the Equities……………………………………………………………… 139

D. The Public Interest…………………………………………………………………… 141

E. The Bond Requirement………………………………………………………………… 142

VI.   CONCLUSION……………………………………………………………………………………………… 144

**HILLMAN, District Judge:**

Currently pending before the Court are: (1) the Joint Motion to Strike or Dismiss Plaintiff's Complaint by Defendants Amerinox Processing, Inc., Robert Carter, Seth Young, and Arthur Gerwitz [Docket Nos. 14 & 16.];[1] (2) Plaintiff Steven Z. Jurista's Cross-Motion for Imposition of Prejudgment Temporary Restraints Against Transfers by Defendants Amerinox, Carter, Young, and Gerwitz [Docket No. 19.]; and (3) the Motion to Dismiss Any and All Claims Asserted Against Defendant General Electric Capital Corporation [Docket No. 26.]   For the reasons set forth below, Defendants Amerinox, Gerwitz, Young, and Carter's Motion to Strike will be denied, but their Motion to Dismiss will be granted in part and denied in part. Furthermore, Plaintiff's Cross-Motion will be denied, and Defendant General Electric Capital Corporation's Motion to Dismiss will be granted in part and denied in part.

---

[1]   Defendants Amerinox, Carter, and Young filed the instant motion now before the Court for disposition.  [Docket No. 14.] On August 22, 2012, Defendant Gerowitz joined in this Motion filed by his co-Defendants.  [Docket No. 16.]

I.   **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The instant matter is an adversary proceeding stemming from the bankruptcy filing of Jermax, Inc. ("Jermax" or "Debtor"). Plaintiff Steven Z. Jurista has been appointed as the Disbursing Agent to represent the Debtor's interests in this suit.  Jermax and corporate Defendant Amerinox Processing, Inc. ("Amerinox") are stainless steel and aluminum processing corporations based in Camden, New Jersey.  Amerinox is a corporate affiliate of and substantially owned by the same shareholders as Jermax. Individual Defendants Carter, Young, and Gerwitz ("individual Defendants" or "Insider Defendants") are alleged to be the sole shareholders, officers, and directors of both Debtor Jermax and Defendant Amerinox.  Defendant General Electric Capital Corporation ("GE") previously provided financing for the Debtor.

According to the facts alleged in the Complaint,[2] Jermax formerly operated a profitable business engaged in the

---

[2]    The Court notes that in his Response in Opposition to Defendant GE's Motion to Dismiss [Docket No. 30], Jurista sets forth a detailed recitation of facts based on statements and conclusions in the Examiner's Report.  (See Pl.'s Resp. Opp'n at 2 ("What follows is a recitation of the detailed facts set forth in the Examiner's Report underlying GE's knowing and substantial conduct in enabling, aiding and abetting the fraudulent transfer of the Debtor's assets.").)  The law is clear, however, that in reviewing a Rule 12(b)(6) motion, a court may only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice.  See S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp., Ltd., 181 F.3d 410, 426 (3d Cir. 1999).  Plaintiff has not attached the Examiner's Report to any of his submissions filed to date with

distribution of stainless steel coil, sheet, and plate products in Camden, New Jersey. (Compl. ¶¶ 12, 13.)  Jermax was wholly owned and operated by individual Defendants Young, Carter, and Gerwitz during this time. (Id. ¶¶ 8-10.)  These same individuals also wholly owned and operated Jermax's affiliate, Defendant Amerinox. (Id. ¶¶ 7, 13.)  Amerinox also owns and operates a facility in Camden. (Id. ¶ 13.)  Beginning in approximately 2008, the individual Defendants allegedly began to siphon funds from Jermax for the benefit of Amerinox. (Id. ¶¶ 19-63.)  Specifically, the Complaint alleges that Amerinox stopped paying rent that it owed to Jermax for leasing its equipment, discontinued paying interest on loans it owed to Jermax, and transferred valuable equipment from Jermax to Amerinox for essentially no consideration. (Id. ¶¶ 23-26, 30-32, 66(f)-(g).)  The Insider Defendants also used Jermax's funds to pay Amerinox's bills, including its employee salaries, medical benefits, and costs for repairs. (Id. ¶¶ 66(a)-(i).)  These actions placed significant financial strain on Jermax, causing it to become unable to pay its various creditors, default on several of its loans, and eventually become

---

the Court, nor is it a matter of judicial notice.  Indeed, the use of the Examiner's Report remains in dispute between the parties, and serves as the basis of the aforementioned Motion to Strike.  As such, the Court will not consider Plaintiff's factual recitation based on the Examiner's Report as set forth in his Response in Opposition, but rather solely limits its analysis to the facts pled in Plaintiff's Complaint.

insolvent. (Id. ¶¶ 38-63.) Despite its precarious financial condition, the Insider Defendants nonetheless issued dividends to themselves totaling over $1 million and advanced $250,000 to Amerinox in October of 2008. (Id. ¶¶ 34-37, 49, 62.)

In 2005, Defendant GE had made a loan to Debtor Jermax. (Id. ¶ 186.) By February of 2009, the balance due on the loan was $1,536,918. (Id.) Also in February of 2009, Jermax allegedly transferred a substantial amount of its equipment — alleged to be worth at least $2.5 million on the transfer date — to Defendant Amerinox. (Id. ¶¶ 22-27, 186, 190.) GE, however, allegedly conspired with Amerinox to set the purchase price for the equipment at $1,536,918 — the amount that remained outstanding on the GE loan. (Id. ¶¶ 186, 198-99.) In reaching this amount, the parties allegedly did not consider the fair market value of the equipment, nor did they include Jermax in its negotiations as the owner of the property. (Id. ¶ 198.) Jermax, however, apparently paid a fee of $413,172.75 to GE in exchange for its consent to transfer the equipment to Amerinox for this price. (Id. ¶ 27.) Plaintiff asserts that Jermax was insolvent at the point of the transfer, and that GE was fully aware of Jermax's distressed financial status during this time. (Id. ¶¶ 189, 192, 199.)

As a result of its mass debt and inability to repay its loans as they became due, Jermax filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey on June 24, 2010.  On July 11, 2011, Jermax filed its First Amended Liquidating Plan of Reorganization ("the Plan" or "the reorganization plan").  During the course of the plan confirmation proceedings, one of Jermax's creditors objected to the Plan's confirmation on the grounds that certain claims it held against the Debtor were not addressed in the Plan.  The creditor and Jermax eventually agreed to the appointment of an Examiner to conduct a limited investigation into whether such causes of action actually exist.  Accordingly, on September 12, 2011, the Bankruptcy Court entered an order ("the Examiner Order") directing the United States Trustee to appoint an Examiner to investigate and report on certain limited matters. On September 23, 2011, the Trustee appointed Alfred T. Giuliano as the Chapter 11 Examiner for the Debtor's estate.  The Bankruptcy Court approved the appointment by order dated September 28, 2011.

The Examiner Order delineated the issues for the Examiner to investigate.  Specifically, the Order provided that the Examiner was appointed for the limited purpose of investigating and reporting on the following issues:

1.   Whether the Debtor's officers and directors breached fiduciary duties that they owed to the Debtor and its creditors;

2.   Whether the allocation of salaries between the Debtor and Amerinox, including the salaries of Young and Carter, was reasonable;

3.   Whether Amerinox should be substantively consolidated with Jermax in accordance with Third Circuit standards for substantive consolidation;

4.   Whether the transfer of equipment by Jermax to Amerinox in February of 2009 constituted a fraudulent transfer;

5.   Whether Jermax's $1 million distribution to shareholders in 2008 constituted a breach of any duty owed by the shareholders to the Debtor and its creditors, and whether such a distribution could be set aside as a fraudulent conveyance;

6.   Whether any material payments made by Jermax to Amerinox or any other entity in which the shareholders have an interest may be avoided as a fraudulent conveyance; and

7.   Whether the shareholders should repay loans that they received from the Debtor.

(Defs.' Mot. Dismiss, Ex. D, 09/12/11 Examiner Order.)  The Examiner Order further provided that: "[t]he Examiner's [R]eport shall state his conclusions as to each of the issues investigated, and as to each issue, shall indicate whether, in the Examiner's opinion, it is in the best interest of the estate and its creditors that the claim be pursued."  (Id.)  In the event that the Examiner identified issues to be worth pursuing, the Order provided that those claims would be assigned to the Disbursing Agent for appropriate action.  (Id.)  If the Examiner identified a claim as unworthy of pursuit, the claim would not be assigned to the Disbursing Agent and would extinguish.  (Id.)  Importantly, the Examiner Order likewise stated that:

> The conclusions reached by the Examiner, the
> Examiner's report and the Examiner's testimony shall
> not be admissible in any court proceeding relating to
> causes of action that may be pursued by the Disbursing
> Agent, and shall not be used as proof or accorded any
> evidential weight in the event of litigation is
> pursued [*sic*] by a Disbursing Agent.

(Id.)  The Examiner issued his Report on April 30, 2012.

The Bankruptcy Court confirmed Jermax's reorganization plan on September 14, 2011.  The Plan appointed Plaintiff Jurista as the Disbursing Agent charged with making distribution payments and pursuing the causes of action identified as worthy of pursuit by the Examiner in his Report.  More specifically, Section III(D)(4) of the Plan, which governs the post-confirmation management process, provides as follows with respect to the appointment of Plaintiff Jurista:

> On the Effective Date, Steven Z. Jurista will be
> deemed appointed as the Disbursing Agent and will be
> responsible for collecting and objecting to Claims,
> collecting outstanding accounts receivable and
> pursuing Causes of Action and Insider Actions, as set
> forth in the order accompanying the Examiner.

(Defs.' Mot. Dismiss, Ex. C, 1st Am. Liq. Plan of Reorg. at 13.)

On June 22, 2012, Plaintiff Jurista initiated the instant action on behalf of the Debtor by filing a Complaint seeking monetary and injunctive relief.  In his Complaint, Jurista asserts the following twenty-four counts against the Defendants: (1) avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 548(a)(2) and 550(a); (2) avoidance and recovery of

fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 550(a) and N.J.S.A. § 25:2-27(a)&(b); (3) fraudulent transfers under 11 U.S.C. §§ 548(a)(1) and 550(a); (4) avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 544 and 550(a) and N.J.S.A. § 25:2-25(a)&(b); (5) common law conversion; (6) common law unjust enrichment; (7) turnover pursuant to 11 U.S.C. § 542; (8) avoidance and recovery of fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(2) and 550(a): recovery of shareholder dividends and loans; (9) avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 544 and 550(a) and N.J.S.A. § 25:2-27(a)&(b): recovery of shareholder dividends and loans; (10) avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 548(a)(1) and 550(a): recovery of shareholder dividends and loans; (11) avoidance and recovery of fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 550(a) and N.J.S.A. § 25:2-25(a)&(b): recovery of shareholder dividends and loans; (12) collection of shareholder loans receivables; (13) breach of the implied covenant of good faith and fair dealing; (14) breach of duties owed by the officers, directors and controlling persons of Jermax; (15) aiding and abetting of employees and/or controlling persons of Jermax; (16) aiding and abetting of employees and/or controlling persons of Amerinox; (17) successor liability of corporate Defendant Amerinox; (18) liability of controlling persons through piercing the corporate veil; (19)

misappropriation of assets, trade secrets, proprietary
information and other assets; (20) constructive trust; (21)
fraudulent transfer: underpayment for transfer of assets; (22)
aiding and abetting of fraudulent transfer by Defendant GE; (23)
avoidance of post-petition transfers; and (24) avoidance and
recovery of transfers to mediate and immediate transferees.

Defendants Amerinox, Carter, and Young filed the instant
Motion to Strike and/or Dismiss the Complaint on August 21,
2012. [Docket No. 14.] Defendant Gerwitz joined this Motion on
August 22, 2012. [Docket No. 16.] Plaintiff Jurista responded
in opposition on August 31, 2012 [Docket No. 17]. Subsumed
within his Response in Opposition, Jurista filed a Cross-Motion
for Imposition of Prejudgment Restraints Against Transfer of
Assets by Defendants. [Docket Nos. 17 & 19.] Defendants filed
a Reply to Jurista's opposition brief on September 10, 2012,
[Docket No. 20], and a Response in Opposition to the Cross-
Motion on September 18, 2012. [Docket No. 22.] Jurista replied
to Defendants' Response in Opposition on September 24, 2012.
[Docket No. 23.] On November 19, 2012, Defendant GE filed its
own Motion to Dismiss Any and All Claims asserted against it.
[Docket No. 26.] Jurista filed his Response in Opposition on
December 27, 2012 [Docket No. 30], and GE filed its Reply on
January 15, 2013. [Docket Nos. 33 & 34.] Accordingly, these
Motions are now ripe for judicial consideration.

## II.   STANDING

Before the Court engages in a discussion of the merits of the parties' arguments, it must initially address whether Jurista has standing to bring this suit in the first instance. Defendant GE argues that Jurista, as the Disbursing Agent appointed to represent the Debtor's interests in this case, lacks standing to pursue the claims asserted against Defendants. Specifically, GE asserts that, to the extent Jurista attempts to represent the rights of Jermax's creditors in this action, he is precluded from doing so under the Bankruptcy Code.  GE further argues that, to the extent that Jurista sues the Defendants on behalf of the Debtor, the doctrine of *in pari delicto* prevents him from doing so.

As an initial matter, the Court notes that GE's argument conflates the threshold requirement of standing with an analysis of an equitable defense doctrine.  Whether a party has the ability to bring a lawsuit in the first instance is an entirely distinct concept from whether an equitable defense shields the opposing party from suit.  The Third Circuit has expressly recognized that: "[a]n analysis of standing does not include an analysis of equitable defenses such as *in pari delicto*.  Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate

questions, to be addressed on their own terms." Official
Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,
267 F.3d 340, 346 (3d Cir. 2001) (citing In re Dublin Secs.,
Inc., 133 F.3d 377, 380 (6th Cir. 1997)).   As such, the Court
considers Disbursing Agent Jurista's standing to bring his
claims separately from Defendants' potential use of the
equitable defense doctrine of *in pari delicto* below.

### A. Constitutional Standing

Standing is a "threshold question in every federal case,
determining the power of the court to entertain suit." Warth v.
Seldin, 422 U.S. 490, 498 (1975).   In order to have standing
under Article III of the Constitution, a party must first
satisfy three requirements.   See Bennett v. Spear, 520 U.S. 154,
167 (1997); Ne. Fl. Chapter of the Ass'n. Gen. Contractors of
Am. v. City of Jacksonville, Fl., 508 U.S. 656, 663 (1993).
Specifically, the party must show that: (1) it suffered an
"injury in fact" that is "real and immediate" and not merely
"conjectural or hypothetical," City of Los Angeles v. Lyons, 461
U.S. 95, 102 (1983) (citations omitted); Lujan v. Defenders of
Wildlife, 504 U.S. 555, 560 (1992); (2) that the injury is
fairly traceable to the defendant's conduct, Allen v. Wright,
468 U.S. 737, 751 (1984); United States v. Hays, 515 U.S. 737,
743 (1995); and (3) that a favorable federal court decision is
likely to redress the injury.   Linda R.S. v. Richard D., 410

14

U.S. 614, 617-18 (1973); <u>Warth v. Seldin</u>, 422 U.S. 490, 505-06 (1975); <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 45-46 (1976).

With regard to the first element of standing, it is well recognized in bankruptcy that an entity such as a trustee, examiner, disbursing agent, or committee may step into the shoes of the debtor to represent its interests in suit on behalf of the bankruptcy estate.  Here, Jermax was appointed as the Disbursing Agent under the terms of the reorganization plan to represent the Debtor's interests, object to claims, and pursue all meritorious causes of action.  (<u>See</u> Defs.' Mot. Dismiss, Ex. C., 1st Am. Liq. Plan of Reorg. at 13.)  The gravamen of his Complaint is that the Defendants injured Jermax's bankruptcy estate when they fraudulently transferred assets from the Debtor to Defendant Amerinox, and when the insider Defendants unlawfully declared a dividend to themselves at a time when Jermax was on the brink of insolvency and inundated with debt. According to Plaintiff, Jermax's debt was significantly expanded and its corporate viability substantially undercut as a result of this conduct.  This type of injury — known as "deepening insolvency" — has been recognized as a cognizable theory of injury for standing purposes by the Third Circuit, federal courts in New Jersey, and New Jersey state courts.  <u>See</u>

15

Lafferty, 267 F.3d at 349-50 (recognizing deepening insolvency as theory of injury under Pennsylvania law); In re Norvergence, Inc., 405 B.R. 709, 750 (Bankr. D.N.J. 2009) (recognizing deepening insolvency as theory of injury under New Jersey law); NCP Litig. Trust v. KPMG, LLP, 187 N.J. 353, 381 (N.J. 2006) ("[W]e find that inflating a corporation's revenues and enabling a corporation to continue in business past the point of insolvency cannot be considered a benefit to the corporation."). As such, the Court finds that Plaintiff has satisfied the first element of Article III standing.

The second and third elements of constitutional standing provide that the party's injury must be fairly traceable to the defendant's conduct, and that a favorable decision from the court is likely to alleviate the injury. See Pa. Prison Soc'y v. Cortes, 622 F.3d 215, 228 (3d Cir. 2010) (citing Friends of the Earth, Inc. v. Laidlaw Envt'l Serv. (TOC), Inc., 528 U.S. 167, 180-81 (2000)). These two elements are "closely related," and therefore "often overlap." Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 142 (3d Cir. 2009) (citing Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 73 (3d Cir. 1990)). The Third Circuit has held that under these two elements, "[i]t is sufficient for the plaintiff to establish a 'substantial

likelihood that the requested relief will remedy the alleged injury in fact.'"  Toll Bros., 555 F.3d at 143 (quoting Vt. Agency of Natural Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 771 (2000)).  Here, Jurista avers that the financial viability of Jermax and its eventual decline into bankruptcy were directly related to the Defendants' unlawful conduct.  As such, the second element of standing is satisfied.  The third element has likewise been fulfilled because, if the Court ultimately determines that the Defendants' actions were unlawful, then the transfers may be avoided, and the subject property or its equivalent value returned back to the Debtor's estate. Therefore, it is evident that Jurista has constitutional standing to bring this suit on behalf of the Debtor.

### B. Prudential Standing

Nonetheless, Defendant GE asserts that Jurista lacks standing to bring suit against it because, at least to some extent, he makes claims on behalf of Jermax's creditors, rather than solely on behalf of the Debtor itself.  Thus, it appears that GE's standing argument is based on the doctrine of prudential standing.

Prudential standing "stems not from the Constitution but from prudent judicial administration.  A court may decide that in certain instances policy militates against judicial review,

such as when the wrong party in interest files suit." In re
Auto. Prof'l, Inc., 389 B.R. 630, 632 (Bankr. N.D. Ill. 2008)
(internal citations, quotations, & alterations of text omitted);
see also Common Cause v. Pennsylvania, 558 F.3d 249, 258 (3d
Cir. 2009) (citing Elk Grove Unified Sch. Dist. v. Newdow, 542
U.S. 1, 11 (2004); Valley Forge Christian Coll. v. Am. United
for Separation of Church & State, Inc., 454 U.S. 464, 474-75
(1982)); Enterline v. Pocono Med. Ctr., 751 F.Supp.2d 782, 784
(M.D. Pa. 2008).  A party lacks prudential standing if it is not
the real party in interest, but instead asserts the rights of
another third party.  Auto. Prof'l, 389 B.R. at 633 (citing
Valley Forge, 542 U.S. at 474-75) (further citation omitted).  A
"real party in interest" is "the person holding the substantive
right sought to be enforced, and not necessarily the person who
will ultimately benefit from the recovery."  Auto. Prof'l, 389
B.R. at 633 (citing Farrell Constr. Co. v. Jefferson Parish,
La., 896 F.2f 136, 140 (5th Cir. 1990)).

        In the realm of bankruptcy law, it is well established that
a trustee in bankruptcy or other similar representative of the
bankruptcy estate (such as a disbursing agent) may step into the
shoes of the debtor to represent its interests in litigation and
bankruptcy resolution.  The estate representative generally has
the authority to bring claims on behalf of the debtor that are

based on both the Bankruptcy Code and applicable state law.
Auto. Prof'l, 389 B.R. at 633 (internal citations omitted).
This ability to bring claims on behalf of the debtor does not
offend notions of prudential standing because "a party is simply
being permitted to step into the shoes of the party with
standing."  Id. at 635.  The estate representative typically
lacks standing, however, to represent the interests of third-
party creditors since he "occupies no better position than the
entity he represents, and can only assert claims which the
corporation could have asserted."  In re D.H. Overmyer
Telecasting Co., 56 B.R. 657, 661 (N.D. Oh. 1986) (citing Caplin
v. Marine Midland Grace Tr. Co., 406 U.S. 416, 429 (1972))
(further citation omitted).  In other words, the representative
can only wear one pair of shoes when standing before the court:
he cannot simultaneously occupy the footwear of the debtor and a
third party creditor.

     Section 544(b) of the Bankruptcy Code is a limited
exception to this general rule.  That section states that:

> [T]he trustee may avoid any transfer of an interest of
> the debtor in property or any obligation incurred by
> the debtor that is voidable under applicable law[3] by a
> creditor holding an unsecured claim[.]

---

[3]     As discussed throughout this Opinion, infra, New Jersey's
Uniform Fraudulent Transfer Act ("UFTA") recognizes a cause of
action for fraudulent transfers and conveyances.

11 U.S.C. § 544(b)(1).  In order to avoid a transfer under section 544(b), the trustee must prove by a preponderance of the evidence that there is a (1) creditor, (2) holding an allowable unsecured claim, and (3) there is a transfer of an interest of the debtor in property, (4) that is voidable under state law. In re Forbes, 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007).

The crux of Plaintiff's allegations against Defendant GE in this suit is that GE aided and abetted the other Defendants in the execution of fraudulent transfers and breaches of fiduciary duties.  GE presently relies on the bankruptcy court's holding in In re Fedders North America, Inc., 405 B.R. 527 (Bankr. D. Del. 2009) to support its argument that Disbursing Agent Jurista lacks standing to pursue such aiding and abetting claims against it under § 544(b).

In Fedders, the court emphasized that a trustee cannot pursue *all* state law causes of action on behalf of creditors, but rather only those that the Code expressly allows him to pursue.  Id. at 548.  The court recognized that § 544(b) provided the trustee's only authority to pursue a creditor's state law claim for fraudulent conveyance under the Code.  Id. However, § 544(b) only permits a trustee to avoid a fraudulent transfer; it does not grant the trustee the authority to recover

damages stemming from the fraudulent transfer as well.  Id.
("[A] bankruptcy trustee is not authorized to pursue every state
law action that creditors of the debtor might pursue, only those
that the Code expressly allows the trustee to pursue. The
trustee's only authority to assert a creditor's state law causes
of action related to fraudulent conveyances is found in section
544(b) of the Code . . . and section 544(b) only permits the
trustee to *avoid* a fraudulent transfer.") (emphasis in
original).  Thus, because the debtor in Fedders sought to
recover damages related to its aiding and abetting claims
against the defendants, the court found that the trustee could
not use § 544(b) as the vehicle for doing so.  Id.

    With § 544(b) and Fedders as a backdrop, GE's argument
would be correct if Jurista relied on § 544(b) as the basis for
his fraudulent transfer claims against GE.  Jurista, however,
does not invoke this statutory section as the premise of his
fraudulent transfer claim as applied to GE.  Rather, Jurista
explicitly states that he is "entitled to avoid this transfer
pursuant to 11 U.S.C. § 548(a)(1)(B)."[4]  (Compl. ¶ 188.)

---

[4]    This statutory section states in full as follows:

    The trustee may avoid any transfer . . . of an
    interest of the debtor in property, or any obligation
    . . . incurred by the debtor, that was made or
    incurred on or within 2 years before the date of the

The predominant view in the federal courts is that § 548(a) only authorizes a trustee, not creditors, to avoid certain transfers by the debtor.  In re Lauer, 98 F.3d 378, 388 (8th Cir. 1996); Auto. Prof'l, 389 B.R. at 633.  In this same vein, however, federal courts have likewise recognized that "[s]ection 548 contains a singular grant of authority to the trustee to avoid fraudulent transfers of a debtor's property *for the benefit of all creditors*."  Surf n Sun Apts., Inc., 253 B.R. 490, 492 (M.D. Fl. 1999).  In the instant case, an analysis of the Complaint's text indicates that Jurista is not asserting claims against Defendant *on behalf of* Jermax's creditors, but rather brings claims to avoid certain transfers of Jermax's property *for the benefit of* both the bankruptcy estate and its

---

> filing of the petition, if the debtor voluntarily or involuntarily
>
> . . .
>
> (B)(i)   received  less  than  a  reasonably  equivalent value in exchange for such transfer or obligation; and (ii)(I) was  insolvent  on  the  date  that  such  transfer was  made  or  such  obligation  was  incurred,  or  became insolvent  as  a  result  of  such  transfer  or  obligation; (II)  was  engaged  in  business  or  a  transaction,  or  was about  to  engage  in  business  or  a  transaction,  for which  any  property  remaining  with  the  debtor  was  an unreasonably  small  capital;  (III)  intended  to  incur, or  believed  that  the  debtor  would  incur,  debts  that would  be  beyond  the  debtor's  ability  to  pay  as  such debts  matured;  or(IV)  made  such  transfer  to  or  for  the benefit  of  an  insider,  or  incurred  such  obligation  to or  for  the  benefit  of  an  insider,  under  an  employment contract  and  not  in  the  ordinary  course  of  business.

11 U.S.C. § 548(a)(1)(B).

creditors as a whole.  See In re Jack Greenberg, Inc., 240 B.R.
486, 506 (Bankr. E.D. Pa. 1999).  Jurista stands in the shoes of
the real party in interest, defined as "the person holding the
substantive right to be enforced, *and not necessarily the person
who will ultimately benefit from the recovery*."  Auto. Prof'l,
389 B.R. at 633 (emphasis added).  Jermax, as the debtor, is the
party holding the rights to be enforced.  Whether third party
creditors may ultimately benefit from the enforcement of these
rights does not change the fact that Jermax is the real party in
interest.  As aptly stated by the Third Circuit: "'[t]he
assertion that this action will benefit creditors is not an
admission that this action is being brought on their behalf. . .
. Simply because the creditors of an estate may be the primary
or even the only beneficiaries of [] a recovery does not
transform the action into a suit by the creditors.'"  Official
Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d
340, 349 (3d Cir. 2001) (quoting Jack Greenberg, 240 B.R. at
506).  Thus, the Court finds that Jurista has not offended
notions of prudential standing under these circumstances.

### C. The *In Pari Delicto* Doctrine

Having determined that Jurista has standing to bring the
above claims, the Court must now determine whether the doctrine
of *in pari delicto* serves as an affirmative defense to those
claims.

The *in pari delicto* doctrine provides that "a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." In re Scott Acquisition Corp., 364 B.R. 562, 566 (Bankr. D. Del. 2007) (citing Lafferty, 267 F.3d at 354). The doctrine is based on the notion that a wrongdoer should not profit from his own misconduct, and courts therefore should refrain from adjudicating a dispute between two wrongdoers. In re Refco Secs. Litig., 2010 U.S. Dist. LEXIS 132778, at *67 (S.D.N.Y. Dec. 6, 2010). When translated literally, the phrase means that "[i]n a case of equal or mutual fault, the position of the defending party is the better one." Scott Acquisition, 364 B.R. at 566 (citing Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985)) (further citation omitted, internal alteration of text omitted).

Defendant GE asserts that controlling Third Circuit precedent, Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340 (3d Cir. 2001), indicates that the *in pari delicto* doctrine applies under these circumstances because Jermax — through the conduct of its sole shareholders, officers, and directors, Defendants Carter, Young, and Gerwitz — was involved in the alleged fraudulent transfers. Defendant argues that, since the Debtor was to some extent at

fault here, Jurista, as the person standing in its shoes for
purposes of bringing suit, is barred from asserting such claims.

    Lafferty arose out of the bankruptcy of two lease-financing
corporations that allegedly operated as a Ponzi scheme.[5]  Id. at
343.  The two corporations were entirely owned, operated, and
managed by one family, the Shapiros, and were part of a vast
network of businesses owned and operated by the family.  Id. at
344, 359.  When the corporations could not raise sufficient
capital through the sale of debt securities to stay afloat, Mr.
Shapiro, the president, director, and sole shareholder,
allegedly caused them to issue fraudulent debt certificates,
which were then sold to innocent individual investors.  Id.  The
Shapiro family apparently worked with certain third parties to
further the scheme, including their attorney, accountant, and
qualified independent underwriters.  Id. at 345.  Eventually,
however, the Ponzi scheme fell apart, driving both corporations
into bankruptcy.  Id.  A committee of creditors appointed by the
bankruptcy trustee to stand in the shoes of the debtors brought
suit against the corporations' shareholders, officers and
directors, the affiliated companies, and the outside third

_____

[5]  A "Ponzi scheme" is defined as "[a] fraudulent investment
scheme in which money contributed by later investors generates
artificially high dividends for the original investors, whose
example attracts even larger investments."  Id. at 344 n.1
(quoting Black's Law Dictionary 1180 (7th ed. 1999)).

parties pursuant to 11 U.S.C. § 541, alleging that their fraudulent scheme wrongfully expanded the debtors' debts out of proportion and forced them into bankruptcy, thereby defrauding the bankruptcy estates and their creditors.  Id.  Lafferty, one of the qualified independent underwriters, argued that the committee was barred from asserting these claims on behalf of the debtors under the doctrine of *in pari delicto*.  Id. at 355. Specifically, Lafferty argued that, since the debtor corporations were wholly owned, managed, and operated by the Shapiros, the debtors and the Shapiro family were essentially indistinguishable and the family's wrongdoing was thus imputable to the corporations they ran.  Id.

The Third Circuit began its analysis with whether the Shapiro family's wrongdoing could be imputed to the debtors, and thereby the committee appointed to represent it in suit.  Id. "Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation."  Id. at 358 (internal citations omitted).[6]  The

---

[6]     The Lafferty Court noted that "[w]hile bankruptcy law mandates that the trustee step into the shoes of the debtor when asserting causes of action, state law generally provides the substantive law governing imputation for state law claims."  Id. (citing O'Melveny & Myers v. FDIC, 512 U.S. 79, 84 (1994)). Although Lafferty dealt with Pennsylvania corporate law, the Third Circuit has subsequently recognized and applied the same

Circuit Court found that the first element was easily satisfied
because members of the Shapiro family served as the officers,
directors, and sole shareholders of the debtor corporations.
Id. at 359.  With respect to the second element, the court
recognized that the Shapiros' mismanagement of the companies and
perpetuation of the fraud was not done for the benefit of the
corporations, and was therefore subject to the "adverse
interest" exception to imputation.  Id.  Under this exception,
"fraudulent conduct will not be imputed [to the corporation] if
the officer's interests were adverse to the corporation and not
for the benefit of the corporation."  Id. (internal citations &
quotation marks omitted).  The Third Circuit's analysis did not,
however, end with the adverse interest exception.  This is
because the adverse interest exception is itself subject to an
exception — the "sole actor" exception.  Id.  According to the
sole actor exception, "if an agent is the sole representative of
a principal, then that agent's fraudulent conduct is imputable
to the principal regardless of whether the agent's conduct was
adverse to the principal's interests."  Id. (internal citations
omitted).  The rationale behind the exception is that "the sole
agent has no one to whom he can impart his knowledge, or from
whom he can conceal it, and [] the corporation must [therefore]

---

two elements of imputation in New Jersey imputation actions.
See Thabault v. Chait, 541 F.3d 512, 527-28 (3d Cir. 2008).

bear the responsibility for allowing an agent to act without accountability." Id. (internal citations omitted).  Thus, since the Shapiro family members were the sole actors of the debtor corporations, the Third Circuit held that the exception applied and their conduct could be imputed to the debtors.  Id. at 360.  Therefore, because the debtor corporations themselves had contributed to the wrongdoing, the Third Circuit held that the committee, standing in the shoes of the debtors, was barred from asserting claims against the defendants under the doctrine of *in pari delicto*.  Id.[7]

GE argues that Lafferty is directly applicable to the instant case.  More specifically, Defendant alleges that individual Defendants Carter, Young, and Gerwitz committed the alleged fraud during the course of their employment at Jermax, and that they were able to effectuate the fraudulent transfers as a result of their controlling positions at the company.  However, their actions were not taken for the benefit of the corporation since the fraud stripped Jermax of its assets, drove it into further debt, and pushed it into eventual insolvency and

---

[7]    It should be noted that the *in pari delicto* doctrine only barred claims against the third party defendants, as it is inapplicable to claims against corporate insiders.  See In re Walnut Leasing Co., No.Civ.A.99-526, 1999 WL 729267, at *5 (E.D. Pa. Sept. 8, 1999), aff'd by Lafferty, 267 F.3d at 346; see also In re Granite Partners, L.P., 194 B.R. 318, 332 (S.D.N.Y. 1996); In re Refco Inc. Secs. Litig., 2010 U.S. Dist. LEXIS 132778 at *76 (S.D.N.Y. Dec. 6, 2010).

bankruptcy.  Thus, GE argues that the "adverse interest"
exception applies under these circumstances.  However, since it
is also alleged that the individual Defendants were the sole
controlling shareholders, officers, and directors that
orchestrated the entire fraudulent scheme, GE argues that the
sole actor exception to the adverse interest exception would
also apply, and the wrongful conduct of the Insider Defendants
would be imputable to Jermax.  GE thus argues that, since Jermax
participated in the wrongful conduct at issue, the equitable
defense doctrine of *in pari delicto* would control, and Jurista,
as the individual appointed to stand in the shoes of the Debtor
for purposes of this lawsuit, would be barred from asserting
claims against Defendants as a result.

    Defendant GE's discussion of <u>Lafferty</u> is correct, and its
holding would apply to the instant facts if Disbursing Agent
Jurista were asserting his claims against Defendants pursuant to
§ 541 of the Code.  GE fails to take into account, however, the
Third Circuit's subsequent decision in <u>In re Personal & Business</u>
<u>Insurance Agency</u>, 334 F.3d 239 (3rd Cir. 2003), which
distinguished <u>Lafferty</u> and is directly applicable to this case.

    In <u>PBI</u>, the debtor corporation, PBI, was used as a pawn in
an illegal scheme perpetrated by its CEO and sole owner, Emil
Kesselring, who caused it to make payments totaling $580,000 to

another corporation in putative repayment for loans that he had
fraudulently obtained from that company.  Id. at 240-41.  PBI
eventually folded and filed for bankruptcy protection, at which
point a bankruptcy trustee was appointed to represent its
interests in the bankruptcy proceedings.  Id. at 241-42.  The
trustee sought to recover the funds transferred by Kesselring
for the benefit of the debtor's estate and its creditors,
arguing that they constituted fraudulent conveyances under § 548
of the Code.  Id. at 242.  The defendants, however, argued that
Lafferty controlled and that Kesselring's wrongful conduct
should be imputed to PBI, and that the sole actor exception
applied since he was PBI's sole shareholder and officer.  Id. at
244.  The defendants claimed that, under Lafferty, the in pari
delicto defense would therefore bar the trustee from asserting
claims against them since the debtor also engaged in the
wrongdoing at issue.  Id.

     The Court of Appeals, however, found Lafferty to be
distinguishable.  Notably, the court recognized that the
creditor committee in Lafferty brought suit under § 541 of the
Bankruptcy Code, which permits a representative of the debtor's
estate to bring suit as a successor to the debtor's interest,
and explicitly directs courts to evaluate all legal and
equitable interests of the debtor as they existed at the

30

commencement of the bankruptcy.[8]  <u>Id.</u> at 245.  Thus, the <u>Lafferty</u>

Court concluded that, because the committee represented the

debtor's interests as they existed at the commencement of the

bankruptcy under § 541, it merely replaced Mr. Shapiro as the

manager of the debtor and could not be considered to be an

innocent successor in interest.  <u>Id.</u> (discussing <u>Lafferty</u>, 267

F.3d at 356-57).  The trustee in <u>PBI</u>, however, brought his

claims against the defendants under a different section of the

Bankruptcy Code — § 548.[9]  <u>PBI</u>, 334 F.3d at 245.  The Court of

----

[8]     This section states, in relevant part, as follows:  "The
commencement of a case under section 301, 302, or 303 of this
title creates an estate.  Such estate is comprised of . . . all
legal or equitable interests of the debtor in property as of the
commencement of the case."  11 U.S.C. § 541(a)(1).

[9]     That section states, in relevant part, as follows:

    (a)(1)  The trustee may avoid any transfer [ ] of an
    interest of the debtor in property, or any obligation
    [ ] incurred by the debtor, that was made or incurred
    on or within 2 years before the date of the filing of
    the petition, if the debtor voluntarily or
    involuntarily--
        (A) made such transfer or incurred such
        obligation with actual intent to hinder, delay,
        or defraud any entity to which the debtor was or
        became, on or after the date that such transfer
        was made or such obligation was incurred,
        indebted; or
        (B)(i) received less than a reasonably equivalent
        value in exchange for such transfer or
        obligation; and
        (ii)(I) was insolvent on the date that such
        transfer was made or such obligation was
        incurred, or became insolvent as a result of such
        transfer or obligation;

31

Appeals found that this made a significant difference, because, unlike § 541, § 548 does not bar consideration of events that occurred after the commencement of the bankruptcy.  Id. at 245-46.  ("We therefore agree with the Trustee that Lafferty does not extend to the situation at bar because the Trustee is acting under § 548 rather than § 541.").  The Third Circuit therefore found that nothing in the language of § 548 precluded it from finding that Kesselring's pre-petition wrongful conduct should not be imputed to the trustee, appointed post-petition to represent the interests of the bankruptcy estate and its creditors as a whole.  Id. at 246-47 ("There is no limiting language in § 548 similar to that in § 541, and without that language there is no reason not to follow the better rule, under which Kesselring's conduct would not be imputed to the Trustee because it would lead to an inequitable result in this case.").  Thus, the Third Circuit held that the *in pari delicto* doctrine

---

> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

did not bar suit against the defendants for actions taken by a bankruptcy estate's representative pursuant to § 548 of the Bankruptcy Code.

Here, Jurista, as the disbursing agent appointed by the trustee to stand in the shoes of the Debtor for purposes of this suit, brings his claims against Defendants pursuant to § 548 of the Bankruptcy Code.  As such, the Third Circuit's holding in PBI, rather than Lafferty, controls in this case.  Under PBI, the doctrine of *in pari delicto* does not apply to the instant circumstances, and Jurista is not barred from asserting his claims against the Defendants.[10]  Thus, since the *in pari delicto*

---

[10]    Furthermore, even if, as asserted by Defendants, Lafferty did apply to the instant case, Defendants nonetheless fail to note that the cloak of *in pari delicto* would not shroud all of them from suit, as its protections only extend so far.  This is because "*in pari delicto* will not preclude the claims against corporate insiders. Vis-a-vis their corporations, insiders cannot avoid the consequences of their own handiwork."  In re Walnut Leasing Co., No.Civ.A.99-526, 1999 WL 729267, at *5 (E.D. Pa. Sept. 8, 1999), aff'd by Lafferty, 267 F.3d at 346; see also In re Granite Partners, L.P., 194 B.R. 318, 332 (S.D.N.Y. 1996); In re Refco Inc. Secs. Litig., 2010 U.S. Dist. LEXIS 132778, at *76 (S.D.N.Y. Dec. 6, 2010).  Our sister courts have previously recognized that:

> The [*in pari delicto*] doctrine is inapplicable to claims by or on behalf of the corporation against insiders for damages caused by their misconduct as corporate insiders.  The reasoning is that it would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation as a defense.

Id. at *76 (internal citations omitted).  Therefore, even if Lafferty did control the instant scenario — which it clearly

doctrine will not shield Defendants from liability here, they cannot rely on it to be dismissed from suit on this basis.

**III. THE MOTION TO STRIKE**

Having found that Jurista has standing to bring claims against Defendants and that the equitable defense of *in pari delicto* does not bar them from being sued, the Court moves on to discuss the merits of Jurista's claims.  As an initial matter, Defendants[11] move to strike the Complaint in its entirety on the grounds that it is solely based on the contents of the Examiner's Report, which the Bankruptcy Court previously designated as content that is expressly inadmissible in future legal proceedings.  Defendants therefore argue that, since the touchstone of Jurista's Complaint is based on the inadmissible contents of the Examiner Report, the Complaint should be stricken in its entirety and all allegations against them should be dismissed.

**A.    Standard of Law Under Rule 12(f)**

Rule 12(f) of the Federal Civil Rules provides that: "The court may strike from a pleading . . . any redundant,

---

does not — individual Defendants Carter, Young, and Gerwitz would not be able to take advantage of the *in pari delicto* defense and would not be dismissed from suit on this basis. However, given that PBI controls here, the Court merely raises this point as an aside.

[11]    To be clear, Defendants Amerinox, Carter, Young, and Gerwitz are the parties that make this argument.

immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).[12]  The purpose of a Rule 12(f) motion is not to determine unclear or disputed questions of law.  See FDIC v. Modular Homes, Inc., 859 F.Supp. 117, 120 (D.N.J. 1994)(internal citation omitted).  Rather, federal courts have recognized that a properly utilized motion to strike "'may serve to hasten resolution of cases by eliminating the need for discovery, which in turn saves time and litigation expenses.'"  Id. (citing Van Schouwen v. Connaught Corp., 782 F.Supp. 1240 (N.D. Ill. 1991); FDIC v. White, 828 F.Supp. 304, 307 (D.N.J. 1993); Glenside West Corp. v. Exxon Corp., 761 F.Supp. 1100, 1115 (D.N.J. 1991); see also New Jersey v. RRI Mid-Atl. Power Holdings, LLC, No.Civ.A.07-5298, 2010 U.S. Dist. LEXIS 105866, at *23 (E.D. Pa. Sept. 30, 2010)(citations omitted).  Striking a pleading, however, is a "drastic remedy" that is only appropriate "when

---

[12]  Rule 12(f) states in its entirety:

    The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
    (1) on its own; or
    (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f). In the instant case, the Court is not initiating the motion to strike, and therefore subsection (1) is inapplicable. As to subsection (2), the record indicates that Defendants complied with this provision because they filed the instant Motion before they filed an Answer or other responsive pleading.

the grounds for striking it are readily apparent from the face

of the pleadings." Vurimindi v. Fuqua Sch. of Bus.,

No.Civ.A.10-234, 2011 U.S. Dist. LEXIS 96496, at *4-5 (E.D. Pa.

Aug. 29, 2011) (internal citations & quotations omitted).  As

such, motions to strike "are not favored and usually will be

denied unless the allegations have no possible relation to the

controversy and may cause prejudice to one of the parties, or if

the allegations confuse the issues." Id. at *4-5 (internal

citations & quotations omitted).  Courts should exercise caution

in analyzing motions to strike, and should only grant such

motions when "the defense asserted could not possibly prevent

recovery under any pleaded or inferable set of facts." Id.

(internal citations & quotations omitted); see also Morgan Home

Fashions, Inc. v. UTI, U.S., Inc., No.Civ.A.03-0772, 2004 U.S.

Dist. LEXIS 13412, at *28 (D.N.J. Feb. 9, 2004) (internal

citation omitted)("Rule 12(f) should be construed strictly

against striking portions of the pleading on grounds of

immateriality and if the motion is granted at all, the complaint

should be pruned with care.").

     B.   Discussion of the Motion to Strike

     Defendants aver that Plaintiff's Complaint should be

stricken in its entirety because it is solely based upon the

inadmissible contents of the Examiner's Report.  As discussed

36

above, the Examiner Order entered by the Bankruptcy Court on
September 12, 2011 expressly stated that:

> The conclusions reached by the Examiner, the
> Examiner's [R]eport and the Examiner's testimony shall
> not be admissible in any court proceeding relating to
> causes of action that may be pursued by the Disbursing
> Agent, and shall not be used as proof or accorded any
> evidential weight in the event of litigation is
> pursued [*sic*] by a Disbursing Agent.

(Defs.' Mot. Dismiss, Ex. D, Examiner Order.)  Defendants argue
that the entirety of Jurista's Complaint is based on the
inadmissible conclusions reached by the Examiner in his Report,
and that all allegations based on these conclusions should
therefore be dismissed.

In response, Plaintiff avers that, while the Examiner's
Report itself may be inadmissible, the documents and underlying
testimony that the Examiner relied upon his reaching his
conclusions therein are admissible.  Jurista further contends
that he will prove the allegations contained in his Complaint at
trial through the underlying factual record, documents reviewed
by the Examiner, deposition testimony, and his own expert
report, and not by introducing into evidence the contents of the
Examiner's Report.

In support of their argument, Defendants extensively rely
on the Second Circuit Court of Appeals' decision in <u>Lipsky v.
Commonwealth United Corporation</u>, 551 F.2d 887, 893 (2d Cir.

37

1976).  In that case, the SEC had previously filed a complaint against one of the defendants which alleged various securities laws violations.  Id. at 892.  The defendant and the SEC had entered into a consent judgment, which disposed of the complaint.  Id.  In the subsequent Lipsky litigation, the plaintiff attempted to utilize the prior SEC complaint and consent judgment to imply that the defendant had previously engaged in similar improper conduct.  Id. at 891.  The Lipsky defendants moved to strike the portions of the plaintiff's complaint based on the SEC complaint and consent judgment on the grounds that Federal Rule of Evidence 410 precluded their use as evidence at trial.  Id. at 892-93.  The Second Circuit agreed, finding that: "[s]ince it is clear that the SEC-CUC consent judgment, itself, can have no possible bearing on [the plaintiff's] action, the SEC complaint which preceded the consent judgment is also immaterial, for purposes of Rule 12(f)."  Id. at 894.

Contrary to Defendants' assertions, however, Lipsky is distinguishable from the instant case.  In Lipsky, the Second Circuit equated the consent judgment to a *nolo contendere* plea[13]

---

[13]    A *nolo contendre* plea is defined as a plea of no contest, and has the same legal effect as a plea of guilty.  See United States v. Aitoro, 403 F. App'x. 748, 750 (3d Cir. 2010) (affirming Simandle, J.).

— a form of decision that is blatantly barred from admissibility at trial under Rule 410 of the Federal Rules of Evidence.[14]  This case, on the other hand, deals with the contents of a bankruptcy Examiner's Report.  The Examiner Report is not akin to a *nolo contendere* plea because it is merely a summary of a non-party's findings and opinions, and does not amount to an admission of guilt by the Defendants.  Further, no similar evidentiary rule exists that expressly bars the Report from admissibility at trial.  Moreover, the <u>Lipsky</u> Court only struck certain portions of the plaintiff's pleading that were based on the inadmissible evidence.  Here, Defendants seek to strike the entire twenty-four count Complaint based on a single paragraph contained within it: "This Complaint is filed based upon the findings and recommendations of the Examiner as contained in the Examiner's Report and as directed by the relevant provisions of the First

---

[14]    Rule 410 provides as follows:

    In a civil or criminal case, evidence of the following
    is not admissible against the defendant who made the
    plea or participated in the plea discussions:
    (1) a guilty plea that was later withdrawn;
    (2) a nolo contendere plea;
    (3) a statement made during a proceeding on either of
    those pleas under Federal Rule of Criminal Procedure
    11 or a comparable state procedure; or
    (4) a statement made during plea discussions with an
    attorney for the prosecuting authority if the
    discussions did not result in a guilty plea or they
    resulted in a later-withdrawn guilty plea.

Fed. R. Evid. 410(a).

Amended Liquidating Plan of Reorganization as confirmed by order

of the Bankruptcy Court." (Compl. ¶ 18.) The <u>Lipsky</u> Court

itself noted that such blatant dismissal is highly disfavored:

> The Federal Rules of Civil Procedure have long
> departed from the era when lawyers were bedeviled by
> intricate pleading rules and when lawsuits were won or
> lost on the pleadings alone. The courts should not
> tamper with the pleadings unless there is a strong
> reason for doing so.

<u>Lipsky</u>, 551 F.2d at 893. Indeed, federal courts within the

Third Circuit have been highly loathe to grant motions to strike

that would effectively dismiss the entire pleading.[15] See <u>AT&T</u>

<u>Corp. v. Pub. Serv. Enter.</u>, No.Civ.A.99-4975, 2000 U.S. Dist.

LEXIS, at *5-7 (E.D. Pa. Feb. 16, 2000); <u>Michael v. McIntosh</u>,

No.Civ.A.2007-100, 2007 U.S. Dist. LEXIS 78720, at *3-5 (D.V.I.

Oct. 9, 2007).

Furthermore, although the <u>Lipsky</u> Court ultimately struck

certain portions of the plaintiff's pleading, it was careful to

note that courts should avoid striking allegations during the

preliminary stages of litigation when the sole basis for doing

---

[15]   The Court also notes that other federal courts outside the
Third Circuit have criticized the Second Circuit's holding in
<u>Lipsky</u>. <u>See</u> <u>Mills v. United Producers, Inc.</u>, No.Civ.A.11-13148,
2012 U.S. Dist. LEXIS 66979, at * 6-7 (E.D. Mich. May 14, 2012);
<u>United States v. Cohen</u>, 946 F.2d 430 (6th Cir. 1991). The Sixth
Circuit, in fact, blatantly disagrees with the Second Circuit on
this point, and recognizes that consent judgments are admissible
under similar circumstances. <u>See</u> <u>id.</u> at 432-35.

so is that such evidence may eventually be deemed inadmissible
or irrelevant at trial:

> Evidentiary questions . . . should especially be
> avoided at such a preliminary stage of proceedings.
> Usually the questions of relevancy and admissibility
> in general require the context of an ongoing and
> unfolding trial in which to be properly decided. And
> ordinarily neither a district court nor an appellate
> court should decide to strike a portion of the
> complaint . . . on the sterile field of the pleadings
> alone.

Id. at 893.  Here, Defendants' sole basis for striking the
Complaint is that it is based on evidence that will be
inadmissible at trial.  If the Court were to grant this request,
then the entirety of Jurista's action would be eviscerated based
on the skeletal factual record available at this preliminary
stage of proceedings.  See New Jersey v. RRI Energy Mid-Atl.
Power Holdings, LLC, No.Civ.A.07-5298, 2010 U.S. Dist. LEXIS
105866, at *9 (E.D. Pa. Sept. 30, 2010)(internal citations
omitted)("Striking a pleading is a drastic remedy which should
be used sparingly, partly because of the practical difficulty of
deciding cases without a factual record.").  Other federal
courts encountering similar circumstances have recognized that,
even if the evidence may eventually be deemed inadmissible at
trial, the more prudent course of action is to keep the evidence
in the record until that later point in time.  See Steak Umm
Co., LLC v. Steak 'Em Up, Inc., No.Civ.A.09-2857, 2009 U.S.
Dist. LEXIS 101357, at *6 (E.D. Pa. Oct. 30, 2009) ("It is not

necessary at this stage to determine whether or not evidence . .
. will be admissible if offered at trial."); McAndrews Law
Offices v. Sch. Dist. of Phila., No.Civ.A.06-5501, 2007 U.S.
Dist. LEXIS 9888, at * 9 (E.D. Pa. Feb. 12, 2007) ("At this
stage of the proceedings, the court will not strike pleadings
simply because they may not later be admissible at trial.");
Binder v. Pa. Power & Light Co., No.Civ.A.06-2977, 2007 U.S.
Dist. LEXIS 80117, at *3 (E.D. Pa. Aug. 31, 2007).  This Court
agrees that it is not necessary to strike Jurista's allegations
at this point in time simply because of the possibility some or
all of it may later be inadmissible to a factfinder at trial.

It is also worth mentioning that the Lipsky Court expressly
recognized that, in deciding whether to strike a pleading under
Rule 12(f), "it is settled that the motion will be denied,
unless it can be shown that *no evidence* in support of the
allegation would be admissible."  Lipsky, 551 F.2d at 893
(internal citation omitted) (emphasis added).  Here, even though
the Examiner's conclusions may ultimately be inadmissible at
trial, the documents and testimony that the Examiner relied upon
during his investigation to reach those conclusions could be
admissible (assuming, of course, they are not barred from
admission for other legitimate evidentiary purposes).  As such,
given that there would be other evidence available to support

42

Plaintiff's claims, this factor likewise counsels against striking Jurista's Complaint in its entirety at this time.[16] Accordingly, based on the above discussion, Defendants' Motion to Strike Jurista's Complaint will be denied.

**III. THE MOTION TO DISMISS**

As described above, all of the Defendants in this case have moved to dismiss the claims asserted against them in Jurista's Complaint.  In the Complaint, Jurista asserts every claim — with the exception of Count 22 — against the Insider Defendants and Amerinox.  The Insider Defendants and Amerinox move to dismiss all these counts asserted against them — except for Counts 12 and 21 — on the grounds that Jurista has failed to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Civil Rules.

As to Defendant GE, it is readily apparent from the Complaint that Counts 21 and 22 are asserted against it.  It is not as clear, however, whether Jurista likewise meant to assert any of the other claims raised in other counts against GE. Indeed, it is possible to interpret the broad language in Counts 1, 3, 4, 7, 8, 13, 18, 19, 23, and 24 as likewise applying to

---

[16]    To be clear, in so holding, the Court does not find that this supporting evidence would actually be admissible at trial. Indeed, it may ultimately be excluded for other reasons under the Federal Rules of Evidence.  Any inquiry into the admissibility of this evidence, however, is premature at this point in time.

GE.  Thus, out of an abundance of caution, the Court will presume that Plaintiff meant to assert its claims in these counts against Defendant GE as well.

### A.    Standard of Law Under Rule 12(b)(6)

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim.  Bogosian v. Gulf Oil Corp., 562 F.2d 434, 446 (3d Cir. 1977).  However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149-50 n.3 (1984) (quotation and citation omitted).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" Bell Atlantic v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before Twombly.").

Following the Twombly/Iqbal standard, the Third Circuit has instructed a two-part analysis in reviewing a complaint under Rule 12(b)(6).  First, the factual and legal elements of a claim should be separated; a district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Fowler, 578 F.3d at 210 (citing Iqbal, 129 S. Ct. at 1950).  Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'" Id. (quoting Iqbal, 129 S. Ct. at 1950).  A complaint must do more than allege the plaintiff's entitlement to relief.  Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d

Cir. 2008) (stating that the "Supreme Court's Twombly
formulation of the pleading standard can be summed up thus:
'stating . . . a claim requires a complaint with enough factual
matter (taken as true) to suggest' the required element.  This
'does not impose a probability requirement at the pleading
stage,' but instead 'simply calls for enough facts to raise a
reasonable expectation that discovery will reveal evidence of'
the necessary element").  A court need not credit either "bald
assertions" or "legal conclusions" in a complaint when deciding
a motion to dismiss.  In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410, 1429-30 (3d Cir. 1997).  The defendant bears the
burden of showing that no claim has been presented.  Hedges v.
United States, 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr
Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.
1991)).

        Finally, a court in reviewing a Rule 12(b)(6) motion must
only consider the facts alleged in the pleadings, the documents
attached thereto as exhibits, and matters of judicial notice.
S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.,
181 F.3d 410, 426 (3d Cir. 1999).  A court may consider,
however, "an undisputedly authentic document that a defendant
attaches as an exhibit to a motion to dismiss if the plaintiff's
claims are based on the document."  Pension Benefit Guar. Corp.

v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.
1993).  If any other matters outside the pleadings are presented
to the court, and the court does not exclude those matters, a
Rule 12(b)(6) motion will be treated as a summary judgment
motion pursuant to Rule 56.  See Fed. R. Civ. P. 12(b).

 **B.   Discussion of the Motion to Dismiss**

  **1.   The Fraud Claims**

 Counts 1, 2, 3, 4, 8, 9, 10, and 11 of Plaintiff's
Complaint are, to varying degrees, based on allegations of
fraud.  Defendants allege that these Counts must be dismissed
because, not only do they fail to state a claim upon which
relief can be granted under Rule 12(b)(6), but they likewise do
not meet the heightened pleading standards for fraud under Rule
9(b).

 Rule 9(b) of the Federal Rules of Civil Procedure provides
that, when alleging a cause of action based on fraud, "a party
must state with particularity the circumstances constituting
fraud[.]"  Fed. R. Civ. P. 9(b) (emphasis added).  Plaintiffs
may satisfy this requirement by pleading "the date, time and
place of the alleged fraud," or through alternative means that
"otherwise inject precision or some measure of substantiation
into [the] fraud allegation."  Frederico v. Home Depot, 507 F.3d
188, 200 (3d Cir. 2007)(citing Lum v. Bank of Am., 361 F.3d 217,

47

224 (3d Cir. 2004)).  In order to survive dismissal, plaintiffs must also allege "who made a misrepresentation to whom and the general content of the misrepresentation."  Gray v. Bayer Corp., No.Civ.A.08-4716, 2010 WL 1375329, at *3 (D.N.J. Mar. 31, 2010) (citing Lum, 361 F.3d at 224).  The Third Circuit has also indicated, however, that focusing too much on the "particularity language" of Rule 9(b) is "too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules."  Christidis v. First Penn. Mortg. Trust, 717 F.2d 96, 100 (quoting 5 C. Wright & A. Miller, *Fed. Prac. & Proc.* § 1298 at 407 (1969)).

Rule 9(b) applies with equal force to fraud actions brought under federal statutes as to those actions that are based on state law but brought in federal court.  See Frederico, 507 F.3d at 200; Christidis, 717 F.2d at 99.  It has likewise been recognized that "[t]here is no question that Rule 9(b) applies to adversary proceedings in bankruptcy[.]"  See OHC Liquid. Trust v. Nucor Corp., 325 B.R. 696, 698 (Bankr. D. Del. 2005) (citing In re MacGregor Sporting Goods, 199 B.R. 502 (Bankr. D.N.J. 1995); In re OPM Leasing Servs., Inc., 32 B.R. 199 (Bankr. S.D.N.Y. 1983); In re APF Co., 308 B.R. 183, 188 (Bankr. D. Del. 2004); In re Halpert & Co., Inc., 254 B.R. 104 (Bankr. D.N.J. 1999)).

### i.   Counts 1 and 8: Avoidance and Recovery of Fraudulent Transfers under 11 U.S.C. § 548(a)(2)[17]

In Counts 1 and 8 of the Complaint, Jurista seeks to avoid the alleged fraudulent transfers of property that the Insider Defendants caused to occur between Jermax and Amerinox. Defendants, in turn, argue that these two counts must fail as a matter of a law because § 548(a)(2) is inapplicable to this cause of action.  Specifically, Defendants allege that this statutory section does not provide a basis for any claim or cause of action upon which affirmative relief can be granted. (Defs.' Mot. Dismiss at 13.)  In response, Plaintiff asserts that his claims survive dismissal because he has provided a reasonably specific description of the fraudulent transfers of property made by Defendants, the allegedly fraudulent dividends paid out to them, and has likewise provided a detailed analysis of the Debtor's insolvent status during that time. (Pl.'s Resp. Opp'n at 9-10.)

While Plaintiff may have adequately described the transfers, dividends, and Debtor's solvency status in his Complaint, the Court agrees with Defendants that he has failed to identify how these alleged fraudulent transactions relate to

---

[17]    In certain portions of Counts 1 and 8, Jurista refers to "some or all of the Defendants."  As such, in addition to Amerinox and the individual Defendants, the Court will consider the allegations made in Counts 1 and 8 with respect to Defendant GE as well.

§ 548(a)(2) of the Bankruptcy Code.  That section states, in relevant part, as follows:

> A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B)[18] in any case in which:

---

[18]   Section (1)(B), in turn, provides that:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily
>
> . . .
>
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> > (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> >
> > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> >
> > (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> >
> > (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

> (A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or
>
> (B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.

11 U.S.C. § 548(a)(2).  At no point in Jurista's Complaint does he make any reference to "a charitable contribution to a qualified religious or charitable entity or organization." Plaintiff instead describes in detail separate instances in which the Insider Defendants allegedly caused the Debtor to engage in fraudulent transactions with its affiliate, Amerinox. The Court is at a loss to see how § 548(a)(2) applies here, and accordingly finds that Plaintiff's claims in Counts 1 and 8 fail as a matter of law.  Accordingly, they will be dismissed from suit.

### ii.    Counts 2, 4, 9 and 11: Avoidance and Recovery of Fraudulent Transfers under N.J.S.A. § 25:2-25(a)(b) and § 25:2-27 (a)(b)

In Counts 2, 4, 9, and 11 of his Complaint, Jurista seeks to avoid the alleged fraudulent transfers pursuant to two sections of New Jersey's Uniform Fraudulent Transfer Act ("the UFTA"), N.J.S.A. § 25:2-20, et seq.

In Counts 4[19] and 11, Plaintiff brings fraudulent transfer claims under § 25:2-25 of the Act.[20]  That statutory section provides as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (a)  With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (b)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (2)  Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

N.J.S.A. § 25:2-25.  In order to determine whether an actual intent to hinder or defraud existed, courts look to see whether

---

[19]    In Count 4, Jurista states that he is entitled to avoid and recover the value of the transfers from "the Defendants."  Thus, out of an abundance of caution, the Court will presume that Plaintiff meant to bring this claim against Defendant GE as well.

[20]    Plaintiff's claim in Count 4 relates to the fraudulent transfers of equipment and other property, while Count 11 specifically identifies the $1.0 million in shareholder dividends paid to the individual Defendants as fraudulent transfers.  Both claims are based upon the same statutory provision and rooted in the same set of facts, and the Court therefore jointly considers them here.

"badges of fraud" are present.  Meisleman, et al. v. Hamilton Farm Golf Club, LLC, No.Civ.A.11-0653, 2011 U.S. Dist. LEXIS 98594, at *24 (D.N.J. Sept. 1, 2011) (citing Truong v. Kartzman, No.Civ.A.06-5511, 2007 U.S. Dist. LEXIS 48614, at *4 (D.N.J. July 5, 2007); In re Norvergence, Inc., 405 B.R. 709, 732 (Bankr. D.N.J. 2009)).  The eleven commonly recognized badges of fraud are:

> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor was sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Meisleman, 2011 U.S. Dist. LEXIS 98594 at *24-25 (citing N.J.S.A. § 25:2-26).  While a finding of one badge of fraud may

cast suspicion on the transferor's intent, a finding of several badges in one transaction generally provides conclusive evidence of an actual intent to defraud.  <u>Meisleman</u>, 2011 U.S. Dist. LEXIS 98594 at *25 (citing <u>In re Global Outreach, S.A.</u>, No.Civ.A.11-0620, 2011 U.S. Dist. LEXIS 65106, at *5 (D.N.J. June 6, 2011)) (further citation & quotations omitted). Therefore, the proper inquiry is not whether some factors are absent, but rather whether any badges of fraud are present. <u>Meisleman</u>, 2011 U.S. Dist. LEXIS 98594 at *25.

The Court finds that Plaintiff has sufficiently pled several badges of fraud in his Complaint.  First, in ¶¶ 34-37, Jurista specifically identifies Defendants Young, Carter, and Gerwitz as "insiders"[21] that engaged in an actual fraudulent transfers.  Given that they were the sole shareholders and officers of both corporations when the property was transferred from Jermax to Amerinox, this transfer bears resemblance to an insider transaction.  Jurista also avers in this section of the Complaint that Jermax was insolvent during this time.  (Compl. ¶¶ 36, 63, 71.)  As such, he has pled the first and ninth badges of fraud.

Moreover, throughout the Complaint, Jurista asserts that the value of the consideration received by Jermax for certain

---

[21]   The definition and meaning of an "insider" under UFTA is more fully discussed, <u>infra</u>.

property it transferred to Amerinox was not reasonably
equivalent to the asset's value or the amount of the obligation
incurred.  For example, in ¶ 66(f), Jurista states that "Debtor
wrongfully transferred equipment related to the Commerce lease
and GE-financed collateral having a fair market value of
$450,018 and $1,000,000 respectively for no consideration
received by the Debtor in exchange[.]"  (Id. ¶ 66(f).)  Further,
Defendant GE accepted a fee in exchange for its consent to the
equipment transaction.  (Id. ¶ 66(g).)  Thus, Plaintiff has
likewise sufficiently pled the eighth badge of fraud in his
Complaint.

Furthermore, in viewing them in the light most favorable to
Jurista, the allegations made in the Complaint give the general
impression that the various transfers were to some degree
secretive or concealed.  In fact, in ¶ 59, Jurista specifically
states that: "Jermax's officers concealed the dividend by
claiming the $1,000,000 disbursement was for the payment of
trade debt and intentionally misrepresented the discrepancy in
the equity account and did not disclose the true purpose of the
$1,000,000 loan[.]"  (Id. ¶ 59.)  Plaintiff has therefore also
satisfied the second badge of fraud.  Accordingly, in viewing
the Complaint as a whole, it appears that Plaintiff has alleged
several badges of fraud, and therefore has provided sufficient

evidence of an actual intent to defraud.  Counts 4 and 11

therefore will not be dismissed.

In Counts 2 and 9, Plaintiff brings claims under § 25:2-27

of UFTA.[22] Subpart (a) of this statutory section states as

follows:

> (a) A transfer made or obligation incurred by a debtor
> is fraudulent as to a creditor whose claim arose
> before the transfer was made or the obligation was
> incurred if the debtor made the transfer or incurred
> the obligation without receiving a reasonably
> equivalent value in exchange for the transfer or
> obligation and the debtor was insolvent at that time
> or the debtor became insolvent as a result of the
> transfer or obligation.

N.J.S.A. § 25:2-27(a).[23]  In applying this statutory language to

the instant scenario, in order to prevail on his claim, Jurista

would need to show that a party acquired a right to payment from

---

[22]    Plaintiff's claim in Count 2 generally relates to
fraudulent transfers of property caused by the Defendants, while
Count 9 specifically identifies the $1.0 million in shareholder
dividends paid to the individual Defendants as fraudulent
transfers.  Both claims are based upon the same statutory
provision and rooted in the same set of facts, and the Court
therefore jointly considers them here.

[23]    Under UFTA, a "creditor" is defined as a person who holds a
"claim."  N.J.S.A. § 25:2-21.  A "claim," in turn, is defined
as: "a right to payment, whether or not the right is reduced to
judgment, liquidated, unliquidated, fixed, contingent, matured,
unmatured, disputed, undisputed, legal, equitable, secured or
unsecured."  Id.  Further, a "transfer" is defined as "every
mode, direct or indirect, absolute or conditional, voluntary or
involuntary, of disposing of or parting with an asset or an
interest in an asset, and includes payment of money, release,
lease, and creation of a lien or other encumbrance."  N.J.S.A. §
25:2-22.

Jermax before the alleged transfer took place — *i.e.*, became its creditor.  Moreover, the transfer would only be deemed fraudulent under § 25:2-27(a) if Jermax did not receive a reasonably equivalent value in exchange and was insolvent at the time.

In ¶¶ 66(a)-(j), Jurista lists eleven instances purporting to represent fraudulent transfers under § 25:2-27.  The majority of these instances allege that Jurista was "wrongfully overcharged," or paid fees and obligations that should have been allocated to Amerinox.  These allegations are not examples of fraudulent transfers made by Jermax for less than reasonably equivalent value.  Rather, they appear to be examples of charges paid by the Debtor that should have been paid by Amerinox.  As such, these averments do not constitute fraudulent transfers under N.J.S.A. § 25:2-27(a).  However, in viewing the Complaint in the light most favorable to Plaintiff, it appears as though Jurista has at least sufficiently pled a fraudulent transfer in two subparagraphs of ¶ 66.  More specifically, in ¶¶ 66(f) and (g), Jurista asserts that:

> Debtor wrongfully transferred equipment related to the
> Commerce lease and GE-financed collateral having a
> fair market value of $40,018 and $1,000,000
> respectively for no consideration received by the
> Debtor in exchange[.]  Debtor wrongfully paid an
> equipment transfer fee of $13,172.25 to Defendant GE
> to facilitate the wrongful transfer of equipment to
> Defendant Amerinox[.]

(Compl. ¶¶ 66(f),(g).)  Additionally, Jurista has averred that
Jermax was insolvent at the time of these transactions.  (Id. ¶
70.)  These assertions thus sufficiently allege a violation of
N.J.S.A. § 25:2-27(a).

Plaintiff also claims that Defendants violated subpart (b)
of N.J.S.A. § 25:2-27, which relates to fraudulent transfers
made to "insiders."  Subpart (b) of the statute states:

> (b) A transfer made by a debtor is fraudulent as to a
> creditor whose claim arose before the transfer was
> made if the transfer was made to an insider for an
> antecedent debt, the debtor was insolvent at that
> time, and the insider had reasonable cause to believe
> that the debtor was insolvent.

N.J.S.A. § 25:2-27(b).  If the debtor is a corporation, UFTA
defines an "insider" as:

> (1) A director of the debtor; (2) an officer of the
> debtor; (3) a person in control of the debtor; (4) a
> partnership in which the debtor is a general partner;
> (5) a general partner in a partnership described in
> paragraph (4) of subsection (b) of this definition; or
> (6) a relative of a general partner, director,
> officer, or person in control of the debtor.

N.J.S.A. § 25:2-22.  Here, individual Defendants Carter, Young,
and Gerwitz are alleged to be the sole shareholders, officers,
and directors of Jermax.  (Compl. ¶¶ 8-10.)  As such, they meet
the definitional requirements of an "insider" under the statute.
It is also alleged that the individual Defendants were the
"initial transferees" in the alleged fraudulent transactions,

and that Jermax was insolvent on the dates of the transfers. (Id. ¶¶ 76, 77, 78, 80.) Accordingly, Plaintiff has adequately alleged the requisite elements of a § 25:2-27(b) claim as well, and Counts 2 and 9 also survive dismissal.

Therefore, based on the above, Counts 4 and 11[24] based on § 25:2-25 will not be dismissed. Further, Plaintiff's claims in Counts 2 and 9 based on subsection (b) of § 25:2-27 will likewise not be dismissed. As to Plaintiff's § 25:2-27(a) claims, these claims will not be dismissed to the extent that they rely on Jermax's alleged fraudulent transfer of equipment to GE and Amerinox. In all other instances, however, Plaintiff's claims under § 25:2-27(a) fail.

---

[24]   In Count 11, Plaintiff also alleges that, "[a]lternatively, the Transfers referred to hereinabove constitute fraudulent transfers pursuant to N.J.S.A. § 14A:7-14.1(2)." That statutory section states as follows: "A corporation may not make a distribution if, after giving effect thereto, either: (a) The corporation would be unable to pay its debts as they become due in the usual course of its business; or (b) The corporation's total assets would be less than its total liabilities." N.J.S.A. § 14A:7-14.1(2). In ¶¶ 34-63, Jurista alleges that Jermax was insolvent and had unreasonably small capital on hand to pay its debts at the time of the dividend pay-outs. These factual allegations are sufficient to survive a motion to dismiss. While it is true that Plaintiff could have organized his Complaint in a different manner so as to bring a separate claim under N.J.S.A. § 14A:7-14.1(2), he is free to organize his pleading as he sees fit and the Court is required to construe its contents in the light most favorable to him. Accordingly, to the extent Plaintiff bases his claim in Count 11 on N.J.S.A. § 14A:7-14.1(2), the Court will not dismiss it at this time.

### iii.    Counts 3 and 10: Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)[25]

In the third and tenth counts of his Complaint, Jurista avers that Defendants violated § 548(a)(1) of the Bankruptcy Code by making fraudulent transfers, and Plaintiff should therefore be permitted to avoid the transfers under this statutory section.[26]  In response, Defendants assert that Plaintiff's § 548(a)(1) claim must adhere to the heightened pleading standards of Federal Civil Rule 9, and that Plaintiff has merely engaged in a formulaic recitation of the statutory elements of § 548(a)(1).

Section 548(a)(1) is actually comprised of two different subsections — §§ 548(a)(1)(A) and (a)(1)(B) — and each creates its own cause of action and has different statutory requirements.  See In re Rickard, Bankr.No.05-20381, 2006 Bankr. LEXIS 3737, at *1 (Bankr. E.D. Pa. Nov. 13, 2006).  Subsection (a)(1)(A) governs "actual fraudulent transfers," while

---

[25]    In Count 3, Jurista states that he is entitled to avoid and recover the value of the transfers from "the Defendants."  Thus, out of an abundance of caution, the Court will presume that Plaintiff meant to bring this claim against Defendant GE as well.

[26]    Plaintiff's claim in Count 3 generally relates to fraudulent transfers of property committed by the Defendants, while Count 10 specifically identifies the $1.0 million in shareholder dividends paid to the individual Defendants as fraudulent transfers.  Both claims are based upon the same statutory provision and rooted in the same set of facts, and the Court therefore jointly considers them here.

subsection (a)(1)(B) applies to "constructive fraudulent transfers." See OHC Liquid. Trust v. Nucor Corp., 325 B.R. 696, 698 (Bankr. D. Del. 2005); TSIC, Inc. v. Thalheimer, 428 B.R. 103, 109 (Bankr. D. Del. 2010).  Plaintiff does not clarify which subsection Count 3 is based upon.  At this stage of the proceedings, the Court is required to view his pleading in the light most favorable to him.  Thus, out of an abundance of caution, the Court will consider Plaintiff's allegations under both subsections.

Subsection (a)(1)(A) provides that any transfer[27] of a debtor's property made within two years of the filing of its bankruptcy petition may be avoided if the transfer was made with an "actual intent to hinder, delay, or defraud any entity" to whom the debtor was or subsequently became indebted.  11 U.S.C. § 548(a)(1)(A).[28]  Defendants correctly point out that the

---

[27]  A "transfer" is defined in the U.S. Bankruptcy Code as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest."  11 U.S.C. § 101(41).

[28]  Section 548(a)(1)(A) states in its entirety that:

The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
    (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud

heightened pleading requirements of Federal Civil Rule 9 apply to claims brought under this section of the Bankruptcy Code. See OHC Liquid. Trust, 325 B.R. at 698 (citing In re MacGregor Sporting Goods, 199 B.R. 502 (Bankr. D.N.J. 1995))(further citation omitted) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under [] § 548, whether it is based upon actual or constructive fraud."). Thus, in order to survive dismissal, Plaintiff must have identified a precise date, time, or place of the alleged fraud, or else inject some other measure of precision and substantiation into his pleadings. See Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007).

In ¶ 35 of the Complaint, Plaintiff specifically alleges that: "[t]he $1.0 million in dividends paid in October 2008 was an actual fraudulent transfer." (Compl. ¶ 35.) In support of this allegation, Jurista avers in ¶¶ 34 through 63 that individual Defendants Young, Carter, and Gerwitz were paid $1.0 million in dividends at a time when Jermax had massive outstanding debt, was reporting significant losses on its balance sheet, and ultimately became insolvent. (Id. ¶¶ 34-63.)

---

             any entity to which the debtor was or became, on
             or after the date that such transfer was made or
             such obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A).

Jurista identifies dates on which the alleged transfers took place, precise monetary amounts, and the names of the creditors allegedly defrauded by these transactions.  (Id.)  Jurista also clearly breaks down the exact dividend amount paid to each of the individual Defendants, and the precise amounts owed to certain creditors at this time.  (Id. ¶¶ 34, 42-63.)  Jurista further avers that these transfers were made within two years prior to the date of the filing of Jermax's bankruptcy petition, and "were made with actual intent to hinder, delay or defraud the Debtor's creditors."  (Id. ¶¶ 69, 83.)  As such, the Court finds that Plaintiff has stated with reasonable particularity the circumstances surrounding the alleged actual fraudulent transfers.  Accordingly, Plaintiff has satisfactorily pled an actual fraudulent transfer claim under subsection (a)(1)(A) of the statute.

The Court next considers whether Jurista has likewise sufficiently made out a constructive fraudulent transfer claim under subsection (a)(1)(B).  A fraudulent transfer under this subsection permits the avoidance of any transfer incurred by the debtor if it was made on or within two years of debtor's bankruptcy, and the debtor received less than a reasonably equivalent value in exchange for that transfer.[29]  Thalheimer,

---

[29]    This statutory section states in its entirety as follows:

428 B.R. at 109.   In order to successfully establish a claim

under this subsection of the statute, a party must demonstrate

that:

> [A] transfer or obligation was incurred for less than
> reasonably equivalent value and then must show that
> one of the four conditions set forth in subsection
> (B)(ii) is met, including:
>
> > (1) the debtor was or thereby became insolvent,
> >
> > (2) the debtor was engaged in business or was
> > about to engage in business for which any

---

> The trustee may avoid any transfer . . . of an
> interest of the debtor in property, or any obligation
> . . . incurred by the debtor, that was made or
> incurred on or within 2 years before the date of the
> filing of the petition, if the debtor voluntarily or
> involuntarily
> . . .
> (B) (i) received less than a reasonably equivalent
> value in exchange for such transfer or obligation; and
> > (ii) (I) was insolvent on the date that such
> > transfer was made or such obligation was
> > incurred, or became insolvent as a result of such
> > transfer or obligation;
> > (II) was engaged in business or a transaction, or
> > was about to engage in business or a transaction,
> > for which any property remaining with the debtor
> > was an unreasonably small capital;
> > (III) intended to incur, or believed that the
> > debtor would incur, debts that would be beyond
> > the debtor's ability to pay as such debts
> > matured; or
> > (IV) made such transfer to or for the benefit of
> > an insider, or incurred such obligation to or for
> > the benefit of an insider, under an employment
> > contract and not in the ordinary course of
> > business.

11 U.S.C. § 548(a)(1)(B).

> property remaining with the debtor was an unreasonably small capital,
>
> (3) the debtor intended to incur or believed it would incur debts that would be beyond its ability to repay as they matured, or
>
> (4) the debtor made the transfer or incurred the obligation to or for the benefit of an insider under an employment contract and not in the ordinary course of business.

Fraud upon creditors is presumed once the plaintiff establishes the requisite elements of the statute.

Id. (citing 11 U.S.C. § 548(a)(1)(B)(i),(ii)(I)-(IV); In re Fruehauf Trailer Corp., 444 F.3d 203, 210 (3d Cir. 2006); Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 645 (3d Cir. 1991)).

In ¶ 36 of his Complaint, Jurista avers that the dividends paid to the individual Defendants were constructive fraudulent transfers because Debtor Jermax was insolvent on the date on which they were paid out to the Insider Defendants. (Compl. ¶ 36.) As such, Plaintiff has fulfilled one of the four statutory conditions of subsection (B)(ii). Prior to satisfying one of the four conditions, however, Plaintiff must first establish that the transfers were incurred for less than reasonably equivalent value. See Thalheimer, 428 B.R. at 109. Jurista has not established in his Complaint that the dividends were paid or transferred to the individual Defendants for less than reasonably equivalent value. Accordingly, Plaintiff's

constructive fraudulent transfer claim is dismissed to the extent Jurista bases it on the dividend payouts.

However, in another section of his Complaint, Jurista avers that Jermax wrongfully transferred certain equipment that had fair market values of $450,018 and $1,000,000 to Defendant Amerinox for virtually no consideration whatsoever. (Compl. ¶¶ 66(f),(g).)  Defendant GE is also alleged to have participated in this transaction.  (Id. ¶¶ 27, 66, 196-203.)  It is further alleged that Jermax was insolvent at the time of these transfers, and that the transfers were made within two years of the date of Jermax's bankruptcy petition.  (Id. ¶¶ 69-71.)  As such, to the extent Jurista bases his constructive fraud transfer claim on these equipment transfers, his § 548(a)(1)(B) claim survives dismissal.

Finally, in Count 10, Jurista avers that, "[a]lternatively, the loans made by the Debtor to the Defendant shareholders are book accounts which are due and owing to the Debtor and remain unpaid to date."  (Id. ¶ 134.)  A book account cause of action is rooted in state — rather than federal bankruptcy — law. Under New Jersey law, "[a] book-account cause of action for services provided under a contract arises immediately upon the completion of those services."  Kelsey v. Paparozzi, 2007 N.J. Super. Unpub. LEXIS 524, at *4-5 (N.J. Super. 2007) (citing

Metromedia Co. v. Hartz Mountain Assocs., 139 N.J. 532, 535 (1995)).  Here, Jurista has not identified a contract or services upon which his book account claim could be based.  Therefore, to the extent he seeks to base his fraudulent transfer claim on a book accounts that are due and owing to Jermax at this time, such a claim will be dismissed.

### 2.   Count 5: Conversion

In New Jersey, a claim for conversion is based on the notion that "the wrongful exercise of dominion and control over property owned by another [is] inconsistent with the owners' rights."  Smith v. Cavalier Builders, Inc., No.Civ.A.06-227, 2008 U.S. Dist. LEXIS 23457, at *21 (D.N.J. Mar. 25, 2008) (Hillman, J.) (internal citations & quotation marks omitted).  As such, a conversion claim under New Jersey law consists of three elements: (1) the defendant wrongfully exercised dominion or control over the property of another; (2) the property was taken without authorization;[30] and (3) the property was taken to the exclusion of the owner's rights to it.  78th Infantry Div., World War II Living History Ass'n v. Oprendek, No.Civ.A.11-165, 2011 U.S. Dist. LEXIS 140014, at *15-16 (D.N.J. Aug. 4, 2011) (Kugler, J.)

---

[30]   In order to take property without authorization, one must necessarily exclude the rightful owner of his exclusive right to that property.  Oprendek, 2011 U.S. Dist. LEXIS 140014 at *16.

In the instant action, Jurista asserts that "Defendants improperly exercised dominion and control over, and thus converted the Debtor's assets and funds[.]"  (Compl. ¶ 95.) More specifically, Plaintiff contends that the Defendants conspired to transfer Jermax's assets to Amerinox for an unreasonably low purchase price in an effort to obtain capital to pay off a loan that they owed to Defendant GE.  According to Plaintiff, the purchase price "was arrived at and determined arbitrarily by Defendant[s] Amerinox and GE, and not by way of a fair market valuation of the assets or by arms-length negotiation with the Debtor as the seller of the assets."  (Id. ¶ 198.)  Thus, based on this factual recitation, it is apparent that Defendants may have wrongfully exercised control over certain property belonging to Jermax, and that they took this property without consulting with Jermax as the seller and owner of the assets.  Plaintiff's conversion claim therefore survives dismissal.

### 3.   Count 6: Unjust Enrichment

In order to establish a claim for unjust enrichment under New Jersey law, a plaintiff must show that the defendant "received a benefit and that retention of that benefit without payment would be unjust."  Stewart v. Beam Global Spirits & Wine, Inc., 877 F.Supp.2d 192, 196 (D.N.J. 2012) (Hillman, J.) (internal citations & quotation marks omitted).  An unjust

enrichment claim consists of three elements: (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it.  Mason v. Coca-Cola Co., No.Civ.A.09-0220, 2010 U.S. Dist. LEXIS 65107, at *22 (D.N.J. June 30, 2010) (Hillman, J.) (citing In re K-Dur Antitrust Litig., 338 F.Supp.2d 517, 544 (D.N.J. 2004)).  The doctrine further requires a plaintiff to show that it "expected remuneration from [the] defendant at the time it performed or conferred a benefit on [the] defendant[.]"  Mason, 2010 U.S. Dist. LEXIS at *23 (internal citation omitted).  "However, New Jersey law does not recognize unjust enrichment as an independent tort cause of action.  Thus, where a plaintiff asserts an unjust enrichment cause of action along with [other] tort claims and there appear to be no allegations that the plaintiff expected or anticipated remuneration from the defendant, the unjust enrichment claim should be dismissed."  Id.; see also Torres-Hernandez v. CVT Prepaid Solutions, Inc., No.Civ.A.08-1057, 2008 U.S. Dist. LEXIS 105413, at *25-26 (D.N.J. Dec. 17, 2008); Cafaro v. HMC, No.Civ.A.07-2793, 2008 U.S. Dist. LEXIS 71740, at *37 (D.N.J. Sept. 8, 2008).

A fellow court in this District faced a largely similar factual scenario in Cafaro v. HMC.  In that case, two

individuals operated and served as the principals of a hedge fund, HMC International LLC, and recruited approximately eighty investors to partake in their business venture related to the fund.  Id. at *2.  The individuals also operated another hedge fund, Essex Morgan LLC, which drew from HMC's funds.  Id.  The two defendants eventually discontinued operation of Essex Morgan and transferred all of its remaining assets to HMC.  Id.  The plaintiffs, a group of fund investors, brought suit against the two funds and the individual defendants, asserting, *inter alia*, a host of securities fraud, contract, and tort claims, including a claim for unjust enrichment.  Id.  The plaintiffs specifically argued that Essex Morgan unjustly retained a benefit through its use of HMC funds.  Id. at *36.  The court found that the conduct underlying the plaintiffs' unjust enrichment claim sounded in tort.  Id.  Accordingly, it dismissed the claim because it was brought alongside other tort claims, and New Jersey does not recognize unjust enrichment as an independent tort cause of action.  Id.

This Court finds Cafaro to be particularly instructive here.  Just as in that case, the conduct underlying Plaintiff's unjust enrichment claim — namely, that the individual Defendants conducted the Debtor's business for their own benefit without proper authority, pirated the Debtor's assets, fraudulently

transferred Jermax's assets to Amerinox, and apparently had

Jermax pay Amerinox's bills (Compl. ¶¶ 97-102) — likewise sounds

in tort rather than contract.[31]   Indeed, Plaintiff brings his

unjust enrichment claim amongst a myriad of other tort and fraud

claims.  As indicated above, New Jersey does not recognize

unjust enrichment as an independent tort cause of action, and,

as such, Plaintiff's unjust enrichment claim should be dismissed

from suit.

---

[31]    The Supreme Court of New Jersey has recognized that unjust
enrichment can constitute a form of quasi-contractual liability.
See Stewart, 877 F.Supp.2d at 196 (citing Callano v. Oakwood
Park Homes Corp., 219 A.2d 332, 334 (N.J. 1966)).  Although
Plaintiff cursorily avers in one sentence of his lengthy
pleading that Jermax's "financing and leasing agreements"
prohibited Jermax's transfer of title to its equipment to
Defendant Amerinox (Compl. ¶ 23), as expressed above, the
specific basis of Jurista's unjust enrichment is rooted in
Defendants' allegedly tortious and fraudulent conduct.
    Indeed, the Cafaro Court faced a similar situation.  The
plaintiffs in that case asserted both unjust enrichment and
breach of contract claims against the defendants, but the court
found that the alleged conduct underlying the unjust enrichment
claim was clearly rooted in tort.  The same logic applies to
this case.
    Furthermore, the Court notes that Plaintiff seeks punitive
damages with respect to his unjust enrichment claim.  It is well
known that punitive damages are generally not available in
contract disputes.  Mon Cheri Bridals, Inc. v. Wen Wu,
No.Civ.A.04-1739, 2008 U.S. Dist. LEXIS 79954, at *12 (D.N.J.
Oct. 7, 2008); Kurnick v. Cooper Health Sys., 2008 N.J. Super.
Unpub. LEXIS 2267, at * 39 (N.J. Super. July 24, 2008) (internal
citations omitted) ("With rare exception, punitive damages are
not available in an action for a breach of contract.").  Thus,
this further implies that Plaintiff's unjust enrichment claim
sounds in tort.

The Court further notes that, while Plaintiff alleges that Defendants unjustly enriched themselves at the Debtor's expense and utilized Jermax to pay Amerinox's bills, he has not alleged that Jermax anticipated any specific form of remuneration from the Defendants.  The law clearly indicates that "[t]he unjust enrichment doctrine requires that [the] plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant[.]"  Cafaro, 2008 U.S. Dist. LEXIS 71740 at *37.  Given that Plaintiff has not sufficiently pled as much in his Complaint, this further shows that he has not established a viable unjust enrichment claim. Thus, Count 6 will likewise be dismissed.

### 4.    Count 7: Turnover under 11 U.S.C. § 542[32]

Section 542 of the Bankruptcy Code provides that an entity that is wrongfully in possession of property that rightfully belongs to the debtor should turn that property over to the debtor's estate.[33]  Importantly, claims for turnover are not the

---

[32]    Jurista requests the Court to enter judgment in the Debtor's favor in Count 7 with respect to "all Defendants."  As such, in addition to Amerinox and the individual Defendants, the Court will consider the allegations made in Count 7 with respect to Defendant GE as well.

[33]    Section 542 of the Bankruptcy Code provides, in relevant part, as follows:

        (a)[A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363

same as claims for damages.  Rather, "[t]urnover under § 542 of
the Code is not intended as a remedy to determine disputed
rights of parties to property. [] [I]t is intended as a remedy
to obtain what is acknowledged to be property of the bankruptcy
estate." In re Weinstock, Bankr.No.96-31147, 1999 Bankr. LEXIS
616, at *30 n.14 (Bankr. E.D. Pa. May 25, 1999) (internal string
citation omitted).  "Implicit in the bankruptcy concept of
turnover is the idea that the property being sought is clearly
property of the Debtor but not in the Debtor's possession.
Turnover . . . is *not* the provision of the Code to determine
the rights of the parties[.]" In re FLR Co., Inc., 58 B.R. 632,
634 (Bankr. W.D. Pa. 1985) (emphasis added).

    In Count 7, Jurista requests the Court to grant him
compensatory and punitive damages for his turnover claim.  As
such, he seeks to determine the Debtor's rights to the property,

---

        of this title, or that the debtor may exempt under
        section 522 of this title, shall deliver to the
        trustee, and account for, such property or the value
        of such property, unless such property is of
        inconsequential value or benefit to the estate.

        (b) [A]n entity that owes a debt that is property of
        the estate and that is matured, payable on demand, or
        payable on order, shall pay such debt to, or on the
        order of, the trustee, except to the extent that such
        debt may be offset under section 553 of this title
        against a claim against the debtor.

11 U.S.C. § 542(a),(b).

and to be compensated for the Defendants' wrongful withholding
of this property.  See Weinstock, 1999 Bankr. LEXIS 616 at *30
n.14 ("Since the purpose of the instant litigation is to
determine the defendants' liability, if any, to Debtor, it does
not constitute a turnover proceeding.").  Moreover, it has not
been clearly established — as turnover law requires — that any
property within the Defendants' possession rightfully belongs to
Jermax.  To the contrary, the right to certain pieces of
property which Jurista maintains rightfully belongs to the
Debtor — for example, the shareholder dividends and equipment —
remains in contentious dispute between the parties.  Thus,
Plaintiff's turnover claim also fails on these grounds.
Accordingly, Count 7 will be dismissed.

### 5.  Count 13: Breach of the Implied Covenant of Good Faith and Fair Dealing[34]

Under principles of New Jersey law, every contract in the
state contains an implied covenant of good faith and fair
dealing in the performance and enforcement of its terms.  See
Coldwell Banker Real Estate, LLC v. Plummer & Assocs.,
No.Civ.A.09-1313, 2009 U.S. Dist. LEXIS 91920, at *8-9 (D.N.J.
Oct. 2, 2009) (citing Wilson v. Amerada Hess Corp., 168 N.J.

---

[34]   Jurista requests the Court to enter judgment in the
Debtor's favor in Count 13 with respect to "all Defendants."  As
such, in addition to Amerinox and the individual Defendants, the
Court will consider the allegations made in Count 13 with
respect to Defendant GE as well.

236, 244 (2001)).  As indicated by the New Jersey Supreme Court,
the implied covenant of good faith and fair dealing evinces a
commitment that "neither party shall do anything which will have
the effect of destroying or injuring the right of the other
party to receive the fruits of the contract."  Coldwell, 2009
U.S. Dist. LEXIS 91920 at *9 (citing Sons of Thunder, Inc. v.
Borden, Inc., 148 N.J. 396, 421 (1997)).  A party can be held
liable for a breach of the implied covenant even if it has not
violated an express term of the contract because the covenant
"may fill in the gaps where necessary to give efficacy to the
contract as written."  Fields v. Thompson Printing Co., 363 F.3d
259, 271-72 (3d Cir. 2004).  Moreover, the implied covenant will
not override the express terms of the contract.  Cargill Global
Trading v. Applied Dev. Co., 706 F.Supp.2d 563, 580 (D.N.J.
2010)(citing Sons of Thunder, Inc., 148 N.J. at 423; Fields, 363
F.3d at 272; Wilson, 168 N.J. at 244).  It has been recognized,
however, that "the covenant is to be interpreted narrowly, lest
it become an all-embracing statement of the parties' obligations
under contract law, imposing unintended obligations upon parties
and destroying the mutual benefits created by legally binding
agreements."  Cargill Global Trading, 706 F.Supp.2d at 580
(internal citations & quotation marks omitted).

As an initial matter, the Court notes that — unlike most breach of implied covenant claims — Plaintiff here has not also brought a standard breach of contract claim against Defendants. Several of our sister courts in neighboring districts do not recognize a breach of implied covenant claim independent of a standard breach of contract claim under such circumstances. See Zaloga v. Provident Life & Acc. Ins. Co. of Am., 671 F.Supp.2d 623, 630 (M.D. Pa. 2009); McHale v. NuEnergy Grp., No.Civ.A.01-4111, 2002 U.S. Dist. LEXIS 3307, at *23 (E.D. Pa. Feb. 27, 2002); Designers N. Carpet, Inc. v. Mohawk Indus., Inc., 153 F.Supp.2d 193, 196 (E.D.N.Y. 2001) ("A claim for breach of an implied covenant of good faith and fair dealing does not provide a cause of action that is separate and different from a breach of contract claim.  Rather, breach of that duty is merely a breach of the underlying contract."); see also Gallo v. PHH Mortg. Corp., No.Civ.A.12-1117, 2012 U.S. Dist. LEXIS 182954, at *36-37 (D.N.J. Dec. 31, 2012) (Hillman, J.) (applying Pennsylvania law).  New Jersey, however, does recognize an independent cause of action based upon the covenant of good faith and fair dealing in three limited instances:

> (1) To allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations;
>
> (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a

pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and

(3) to rectify a party's unfair exercise of discretion regarding its contract performance.

Kim v. Baik, No.Civ.A.06-3604, 2007 U.S. Dist. LEXIS 13553, at *11 (D.N.J. Feb. 27, 2007) (Kugler, J.) (citing Seidenberg v. Summit Bank, 791 A.2d 1068, 1076 (N.J. Super. 2002)).

The second scenario is potentially implicated in this case. In such instances, a plaintiff's recovery for a breach of the implied covenant often hinges upon its ability to prove that the defendant acted in bad faith or in accordance with a dilatory motive. Cargill Global Trading, 706 F.Supp.2d at 580 (citing Wilson, 168 N.J. at 251) (internal parenthetical omitted). While the law does not require the parties to behave altruistically toward each other; a plaintiff must at least provide sufficient evidence "to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." Cargill Global Trading, 706 F.Supp.2d at 580 (internal citations & quotation marks omitted). Further, in assessing the conduct of the parties to a contract, New Jersey courts utilize the definitions of "good faith" and "bad faith" adopted the Uniform Commercial Code ("UCC"). "Good faith" is defined by the UCC as "honesty in fact and the

observance of reasonable commercial standards of fair dealing in the trade," while "bad faith" evinces conduct that transgresses "community standards of decency, fairness or reasonableness." Id. (citing N.J.S.A. § 12A:2-103(1)(b); Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Ass'n, 182 N.J. 210, 224 (2005)). This District also recognizes that "subterfuges and evasions" in the performance of a contract constitutes a violation of the implied covenant, regardless of whether the actor believed his conduct was justified. Interstate Realty Co., LLC v. Sears, Roebuck & Co., No.Civ.A.06-5997, 2009 U.S. Dist. LEXIS 35141, at *33-34 (D.N.J. Apr. 27, 2009) (internal citations omitted).

Here, Defendants assert that Plaintiff's implied covenant claim consists of nothing more than bald conclusory statements. (Defs.' Mot. Dismiss at 35.)[35] Although the Court notes that Plaintiff could certainly have provided more factual support with respect to the alleged contracts at issue in his pleading, at this stage of the proceedings it does not matter whether Jurista will ultimately prevail on his claim, but only whether he has provided enough facts to proceed forward and "offer

---

[35]    Defendants also argue that Jurista's Complaint fails to allege the existence of a contract upon which the implied covenant claim can be based. (Defs.' Mot. Dismiss at 34-35.) However, as discussed infra, Plaintiff does reference certain agreements in his Complaint upon which his claim could be based.

evidence to support the claim." <u>Bell Atlantic v. Twombly</u>, 550
U.S. 544, 563 n.8 (2007).  In ¶ 23 of the Complaint, Jurista
avers that "Debtor Jermax transferred title to its financed
equipment to Defendant Amerinox in February 2009 although the
financing and leasing agreements prohibited the transfers."
(Compl. ¶ 23.)  Plaintiff has also alleged that Defendant GE
made a loan to Jermax in 2005.  (<u>Id.</u> ¶ 186.)  Presumably, this
loan was supported by some form of loan agreement between the
parties.  As such, Plaintiff has alleged the existence of
certain contracts upon which his present implied covenant claim
could be premised.  Moreover, Plaintiff has also alleged enough
facts to support a preliminary finding that Defendants
potentially acted in bad faith under these circumstances.
Notably, he asserts that Jermax received less than a reasonably
equivalent value in exchange for the transfer of the equipment,
and that Defendant GE played a significant role in the execution
of this fraudulent transfer by conspiring with Amerinox to sell
the equipment for the amount that remained outstanding on its
loan to Jermax and accepting a fee in exchange for its consent.
(<u>Id.</u> ¶¶ 26, 27, 186-203.)  It is also alleged that Amerinox
stopped paying rent for the processing equipment upon the
transfer of title, which resulted in outstanding payments of
$450,018.00.  (<u>Id.</u> ¶¶ 24-26.)  Such conduct echoes in dishonesty
and is not in accord with reasonable commercial standards of

fair dealing in New Jersey.  Moreover, as indicated above, regardless of whether any of the Defendants believed their conduct was justified, subterfuges and evasions in the performance of a contract can equate to a violation of the implied covenant.  Plaintiff has generally asserted in his Complaint that the Defendants' actions related to the equipment transfers were at least to some degree secretive and evasive.

Thus, although Plaintiff's factual allegations related to the implied covenant claim are largely underdeveloped at this time, they are sufficient to survive dismissal and may proceed forward to the discovery phase of proceedings.

### 6.  Count 14: Breaches of Fiduciary Duties

In Count 14, Plaintiff asserts that individual Defendants Carter, Young, and Gerwitz breached the fiduciary duties of due care, loyalty, and good faith that they owed to Jermax as its officers and directors.  (Id. ¶¶ 154-56.)  More specifically, Plaintiff claims that the individual Defendants "were not permitted to use their positions of trust and confidence to further their private interests in violation of the requirement of undivided and unselfish loyalty to the Debtor so there would be no conflict between duty and self-interest."  (Id. ¶ 155.)

80

In order to establish a cause of action for a breach of fiduciary duty in New Jersey, a plaintiff must show that: (1) the defendant had a duty to the plaintiff, (2) that the duty was breached, (3) that injury to plaintiff occurred as a result of the breach, and (4) that the defendant caused that injury. Goodman v. Goldman, Sachs & Co., No.Civ.A.10-1247, 2010 U.S. Dist. LEXIS 132593, at *10 (D.N.J. Dec. 14, 2010) (citing St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n, No.Civ.A.04-4540, 2005 U.S. Dist. LEXIS 46607, at * 9 (D.N.J. May 18, 2005); In re ORFA Sec. Litig., 654 F.Supp. 1449, 1457 (D.N.J. 1987)).  Moreover, in all corporate fiduciary relationships, corporate officers are presumed to be informed, and acting in good faith and in the best interests of the corporation.  See Richardson v. Ulsh, No.Civ.A.06-3934, 2007 U.S. Dist. LEXIS 67698, at *25 (D.N.J. Sept. 13, 2007) (internal citation omitted); In re Forman Enter., Inc., 273 B.R. 408, 413 (Bankr. W.D. Pa. 2002).

The fiduciary duties owed by directors, however, are not without limits.  New Jersey courts have long recognized that:

> A decision made by a board of directors pertaining to the manner in which corporate affairs are to be conducted should not be tampered with by the judiciary so long as the decision is one within the power delegated to the directors and there is no showing of bad faith.

In re PSE & G Shareholder Litig., 173 N.J. 258, 306 (N.J. 2002)
(citing Exadaktilos v. Cinnaminson Realty Co., 167 N.J. Super.
141, 151 (N.J. Super. 1979)).  Indeed, the law seeks to promote
and protect the full and free exercise of directorial business
judgment.  Maul v. Kirkman, 207 N.J. Super. 596, 614 (N.J.
Super. 1994).  Accordingly, "the business judgment rule" has
been fashioned as a means of protecting directorial decision-
making from judicial interference and constant hindsight.  Under
this rule, corporate director decisions are presumed to have
been made in good faith and will not be questioned by the
courts.  Id.; see also Frost v. Adiletta, Bankr.No.03-17230,
2009 U.S. Bankr. LEXIS 5533, at *25 (Bankr. D.N.J. Jan. 15,
2009) ("As a matter of good public policy, the business judgment
rule affords corporate directors the ability to take prudent
business risks without the fear of judicial scrutiny if those
risks prove incorrect or unwise in hindsight.").  Thus, "bad
judgment, without bad faith, does not ordinarily make officers
individually liable."  Maul, 207 N.J. Super. at 614.  The rule
operates as a rebuttable presumption, and, in order to overcome
the presumption, the challenger must show that the directors
engaged in some form of self-dealing or other disabling conduct.
Id.  Importantly, the business judgment rule will not shield
directors' decisions in instances of fraud, self-dealing, or

unconscionable conduct.  Id. (citing Daloisio v. Peninsula Land Co., 43 N.J. Super. 79, 93 (N.J. Super. 1956)).

    As stated above, the initial inquiry in breach of duty claims is whether a fiduciary relationship existed between the parties.  "Under New Jersey law, a fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."  Goodman, 2010 U.S. Dist. LEXIS 13259 at *35 (internal citations & quotation marks omitted). Here, Plaintiff avers that the individual Defendants owed fiduciary duties to Jermax as a corporate entity and to its creditors.  It is well established that corporate officers owe a fiduciary duty to the corporation itself.  Francis v. United Jersey Bank, 87 N.J. 15, 20, 28 (N.J. 1981) (internal citation omitted) ("In general, the relationship of a corporate director to the corporation . . . is that of a fiduciary.).  It is recognized in New Jersey that corporate officers owe a fiduciary duty to a corporation's creditors under certain circumstances. See id. at 29; see also VFB, LLC v. Campbell Soup Co., 482 F.3d 624, 636 (3d Cir. 2007); In re Carretta, 219 B.R. 66, 70 (Bankr. D.N.J. 1998) (recognizing fiduciary duty that a corporate officer of an insolvent corporation owes to corporation's

creditors).  As such, Plaintiff has satisfied the threshold inquiry in a breach of fiduciary duty claim.

The next question for the Court to consider is whether this fiduciary relationship and its corresponding duty were violated under the factual circumstances.  Plaintiff argues that the individual Defendants breached their fiduciary duties of care, loyalty, and good faith.  (Compl. ¶¶ 154-56.)  These claims actually constitute separate actions under New Jersey law. Accordingly, the Court analyzes each claim separately below.

### i.  Fiduciary Duty of Care

The Court begins its analysis with the duty of care because this is "the wellspring from which [] more specific duties flow." Francis, 87 N.J. at 20.  Corporate directors are required to exercise their duties with due care because "[t]he institutional integrity of a corporation depends upon the proper discharge [] of those duties." Id.  In assessing whether the corporate directors acted with due care, "the court's inquiry is not into the substantive decision of the [director], but rather is into the procedures employed by the board in making its determination.  In that regard, there is no prescribed procedure that a [director] must follow." PSE&G, 173 N.J. at 291 (internal citations & quotation marks omitted).  Moreover, "a director is held to the standard of that degree of care that an

84

ordinarily prudent director would use under the circumstances."
Francis, 87 N.J. at 28 (internal citation omitted).  The New
Jersey Supreme Court has previously indicated that:

> Directors may not shut their eyes to corporate
> misconduct and then claim that because they did not
> see the misconduct [because] they did not have a duty
> to look. The sentinel asleep at his post contributes
> nothing to the enterprise he is charged to protect.

Id. at 20-21 (internal citations, quotations, & parentheticals
omitted).

In his Complaint, Jurista alleges that the $1.0 million in
dividends disbursed in October of 2008 caused the individual
Defendants to breach their fiduciary duties of care.  (Compl. ¶¶
34, 36.)  He also argues that the individual Defendants abused
their positions as corporate directors in an effort to further
their private interests when they declared the dividends.  (Id.
¶ 155.)

New Jersey courts have previously discussed directorial
decisions regarding dividend payments in the context of
fiduciary duties:

> The question of whether or not a dividend is to be
> declared . . . is exclusively a matter of business
> judgment for the board of directors. Courts will not
> interfere with such discretion unless it be first made
> to appear that the directors have acted . . . in bad
> faith and for a dishonest purpose. It is for the
> directors to say, acting in good faith of course, when
> and to what extent dividends shall be declared.

Maul, 207 N.J. Super. at 614 (internal citations omitted).

Here, Jurista asserts that, when the Defendant directors declared the dividend in October of 2008, Jermax was insolvent, inundated with debts, and completely incapable of paying such debts as they became due.  (Compl. ¶¶ 38-63.)  In other words, Jermax was a severely crippled institution financially at that time.  Despite this precarious financial situation and the fact that Jermax stood on the brink of bankruptcy, the individual Defendants nonetheless allegedly declared a dividend to themselves.  This decision, as alleged, appears to have been made in bad faith or for a dishonest reason.  Furthermore, Jurista also claims that the dividend distribution violated Jermax's Revolving Credit Agreement with one of its financial lending institutions, Fortis.  Specifically, Jurista states that "in late October 2008, the Defendant officers of Debtor Jermax borrowed funds from Fortis and paid an unauthorized dividend of $1.0 million to themselves and advanced $250,000 to Defendant Amerinox." (Id. ¶ 62.)  According to Plaintiff, the Defendant officers' actions eventually caused Jermax to default on its loan from Fortis.  (Id. ¶¶ 57, 60-61.)  Moreover, it is also alleged that "Jermax's officers concealed the dividend by claiming the $1,000,000 disbursement was for the payment of trade debt and intentionally misrepresented the discrepancy in

the equity account and did not disclose the true purpose of the
$1,000,000 loan drawdown from Fortis." (Id. ¶ 59.)  These
allegations further support a finding of bad faith or dishonesty
on the part of the directors in declaring the dividend.

As such, Plaintiff has provided a satisfactory factual
basis to support a finding that the individual Defendants
violated the duty of care that they owed to Jermax under these
circumstances, and they will therefore not be dismissed.

### ii.   Fiduciary Duty of Loyalty and Good Faith

In New Jersey, corporate officers likewise owe a fiduciary
duty of loyalty to the corporate entity which they represent.
The duty of loyalty requires corporate directors act in the best
interests of the corporation, rather than for their own benefit,
and "requires an undivided and unselfish loyalty to the
corporation [and] demands that there shall be no conflict
between duty and self-interest."  Frost, 2009 U.S. Bankr. LEXIS
5533 at *30 (internal citation omitted).  "The threshold inquiry
in assessing whether a director violated his duty of loyalty is
whether the director has a conflicting interest in the
transaction."  Id. (internal citation omitted).  "Directors are
considered to be 'interested' if they either 'appear on both
sides of a transaction []or expect to derive any personal
financial benefit from it in the sense of self-dealing, as

opposed to a benefit which devolves upon the corporation or all stockholders generally." Id. (quoting In re Seidman, 37 F.3d 911, 934 (3d Cir. 1994)).  The director will be found to have breached his duty of loyalty and the business judgment rule will cease to protect a director if instances of self-dealing or usurpation of corporate opportunities are found.  Id.

Directors of corporations also are required to exercise their corporate duties in good faith.  Frost, 2009 U.S. Bankr. LEXIS 5533 at *31 (citing N.J.S.A. § 14A:6-14; Riddle v. Mary A. Riddle Co., 54 A.2d 607 (Ch. 1947)).  The use of good faith does not establish a separate fiduciary duty, but rather is encompassed within the director's duty of loyalty.  Frost, 2009 U.S. Bankr. LEXIS 5533 at *31 (internal citations omitted).  Thus, a director's bad faith conduct lends to a finding that he breached his duty of loyalty to the corporation.  Bad faith is defined as "acting for some purpose other than a genuine attempt to advance corporate welfare or for purposes known to constitute a violation of applicable positive law."  Id. at *31 (internal citations omitted).  In order to show that a director acted in bad faith, the plaintiff must show that he: (1) intentionally acted with a purpose other than that of advancing the best interests of the corporation, (2) acted with the intent to violate applicable positive law, or (3) intentionally failed to

act in the face of a known duty to act, thereby demonstrating a
conscious disregard for his duties.  Id.  (internal citations
omitted).  The business judgment rule will not apply if any of
these violations can be shown.

Plaintiff argues that the individual Defendants violated
their loyalty duties because they were motivated by self-
interest and did not act in the corporation's best interest.
Specifically, as Jermax's sole officers and directors, their
decisions were not "checked" by another party, and they
therefore had the ability to utilize corporate funds for their
own benefit without the potential for interference from another
party.  Indeed, they are alleged to have done so by declaring a
substantial dividend to themselves at a time when the
corporation was otherwise a sinking financial ship.  Moreover,
the Court further recognizes that the individual Defendants
served as the controlling persons of both Jermax and Amerinox.
Thus, their decision to transfer equipment between the two
corporations placed them on both sides of the transaction — a
factor recognized as highly indicative of a fiduciary breach.

If taken as true, Plaintiff's allegations are sufficient to
show that the individual Defendants may have breached their
duties of due care and loyalty under these circumstances.
Specifically, the Defendants are alleged to have acted in bad

faith in furtherance of a fraudulent scheme and for their own self-interest in declaring a substantial dividend to themselves at a time when the corporation was otherwise insolvent.  In such instances, the business judgment rule ceases to protect the conduct of corporate officers.  Accordingly, the Court finds that Plaintiff is entitled to proceed forward with his fiduciary duty claims.

### 7.    Counts 15, 16, 21, and 22: The Aiding and Abetting Claims

According to the facts alleged in the Complaint, Defendant GE made a loan to Debtor Jermax in 2005.  (Compl. ¶ 186.)  By February of 2009, the balance due on the loan was $1,536,918. (Id.)  In an effort to provide capital to pay off the loan balance, Amerinox purchased some of Jermax's equipment, which was alleged to have a fair market value of at least $2.5 million at the time.  (Id. ¶¶ 186-91.)  Amerinox, however, purchased the equipment for only $1,536,918 — the amount that remained outstanding on the GE loan.  (Id. ¶¶ 186, 198-99.)  According to Plaintiff, GE and Amerinox fraudulently agreed to set the purchase price for the equipment at this amount in order to pay off the GE loan.  (Id. ¶ 198, 200-02.)  In doing so, they did not confer with Jermax as the owner of the property, nor did they consider the fair market value of the equipment.  (Id. ¶ 198.)  Furthermore, Jermax allegedly paid a fee of $413,172.75

to GE in order to obtain its consent to transfer the equipment to Amerinox for this price.  (Id. ¶¶ 27, 66(g).)  According to the Complaint, as a result of the significant underpayment for its equipment, Jermax was pushed even further into insolvency.  (Id. ¶¶ 40-41, 199.)  In fact, Jermax reported negative equity on its balance sheet and a book loss of $1,005,371 when the equipment was transferred in February of 2009.  (Id. ¶¶ 40, 41.)  Thus, by virtue of its purported conduct, GE assisted in Jermax's eventual demise to the detriment of its bankruptcy estate and creditors, causing the Disbursing Agent to file suit against all parties involved in the allegedly fraudulent scheme.  (Id. ¶ 203.)  Counts 15 and 16 of Plaintiff's Complaint relate to the alleged aiding and abetting actions committed by the individual Defendants and Amerinox, while Counts 21 and 22 are more specifically related to Defendant GE's alleged aiding and abetting role in the fraudulent scheme.[36]

The Court first considers Plaintiff's aiding and abetting claims against the individual Defendants and Amerinox.  In

---

[36]    As indicated above in the Court's discussion of Plaintiff Jurista's standing in this suit, Defendant GE argues that, under In re Fedders North America, Inc., 405 B.R. 527 (Bankr. D. Del. 2009), Jurista lacks standing to bring his aiding and abetting claims against GE under 11 U.S.C. § 544(b).  As noted above, however, Plaintiff does not seek to avoid the fraudulent transfers related to his aiding and abetting claims against GE under § 544(b), but rather under § 548.  Accordingly, as set forth above, he has standing to bring these claims.

Counts 15 and 16 of his Complaint, Plaintiff alleges that
individual Defendants Carter, Young, and Gerwitz "aided and
abetted, incited, compelled and/or coerced the fraudulent
transfers and the breach of fiduciary duties as to the [D]ebtor
of due care, loyalty and good faith[.]"  (Id. ¶¶ 159, 163.)  The
law of aiding and abetting,[37] by its own definition, involves an
element of aid.  More specifically, the alleged aider-abettor
assists a principal in the execution of a wrongful act that
causes an injury.  See Halberstam v. Welch, 705 F.2d 472, 477
(D.C. Cir. 1983); El Camino Res., Ltd. v. Huntingdon Nat'l Bank,
722 F.Supp.2d 875, 889-900 (W.D. Mich. 2009); In re § 1031 Exch.
Litig., 716 F.Supp.2d 415, 427 (D.S.C. 2010) ("Participation is
defined as substantial assistance in committing the wrong, and
requires the defendant's actions to be a substantial factor in
causing the plaintiff's injury.").  Thus, the aider-abettor is
held liable for the assistance he provided to the principal in
the commission of the act.  The principal, however, cannot be
held liable for aiding and abetting because it is he who
performed the principle wrongful act.  In other words, the

---

[37]   The Court notes that aiding and abetting is dually
applicable in criminal and civil law.  See 18 U.S.C. § 2 (2013)
(United States Code provision for criminal liability); Elec.
Lab. Supply Co. v. Cullen, 977 F.2d 798, 805 (3d Cir. 1992)
(citing Petro-Tech, Inc. v. W. Co. of N. Am., 824 F.2d 1349,
1356 (3d Cir. 1987))(discussing aiding and abetting as theory of
civil liability).

principal cannot be held liable for providing aid to himself in the execution of the wrongful act he committed.

Here, the principal actors that breached their fiduciary duties and committed the alleged fraudulent transfers are the Insider Defendants and one of the corporations they represent, Defendant Amerinox.  As principals, they cannot be held liable for aiding and abetting their own commission of wrongful acts.  Thus, to the extent Plaintiff alleges that they aided and abetted their own wrongful conduct, such claims against them fail as a matter of law.  Accordingly, the aiding and abetting claims against Amerinox and the Insider Defendants alleged in Counts 15 and 16 will be dismissed.

This leaves the aiding and abetting claims asserted against Defendant GE.  Counts 21 and 22 relate to Defendant GE's alleged aiding and abetting role in the fraudulent scheme.  Count 21 generally describes the alleged fraudulent transfers that Jurista seeks to avoid, while specifically asserts that GE aided Amerinox and the individual Defendants with the fraudulent transfers of equipment and assisted in the breaches of their fiduciary duties.  (Id. ¶¶ 200-02.)  Thus, based on the text of these counts, it appears that Plaintiff alleges two different theories of aiding and abetting in his Complaint: (1) aiding and abetting a fraudulent transfer, and (2) aiding and abetting

breaches of fiduciary duties that the Insider Defendants' owed
to Jermax.

The Court will first consider Plaintiff's aiding and
abetting a breach of fiduciary duty claim.  New Jersey law
imposes civil liability for knowingly aiding and abetting an
agent's breach of a duty of loyalty.  See VFB, LLC v. Campbell's
Soup Co., 482 F.3d 624, 633 (3d Cir. 2007) (citing Franklin Med.
Assocs. v. Newark Public Schs., 828 A.2d 966, 974-76 (N.J.
Super. 2003); Hirsch v. Schwartz, 209 A.2d 635, 640 (N.J. Super.
1965)).  The Third Circuit has indicated that the elements of
such a claim are: (1) the existence of a fiduciary relationship,
(2) the fiduciary breached its duty, (3) a defendant, who is not
a fiduciary, knowingly participated in a breach, and (4) damages
to the plaintiff resulted from the concerted action of the
fiduciary and the non-fiduciary.  Campbell's Soup, 482 F.3d at
633.

As indicated in the Court's above discussion in Count 14,
Plaintiff has successfully pled the existence of a fiduciary
relationship between the individual Defendants and Jermax and
its creditors, and that these Defendants may have violated their
fiduciary duties under the present factual circumstances.  Thus,
the first and second elements of aiding and abetting a breach of
fiduciary duty are satisfied here.  Plaintiff further argues

94

that Jermax and its creditors were damaged by the Defendants'
alleged conduct here because the Debtor was driven into further
insolvency and eventual bankruptcy, leaving behind a paucity of
assets to satisfy its financial obligations.  (Compl. ¶¶ 160,
164, 203.)  Thus, the fourth element has likewise been
fulfilled.

The only element remaining for the Court to consider,
therefore, is the third component, *i.e.*, that a defendant, who
is not a fiduciary, knowingly participated in a breach of a
fiduciary duty.  In his pleading, Jurista avers that Defendant
GE participated in the scheme to defraud Jermax and its
creditors: "Defendant GE [] aided and abetted, incited,
compelled and/or coerced the breach of fiduciary duties of due
care, loyalty and good faith owed by Defendants Carter, Young
and Gerwitz to the Debtor, and to present and subsequent
creditors of the Debtor . . . [and] [i]n so doing, Defendant GE
. . . compelled . . . the Defendants Carter, Young and Gerwitz
to use their positions of trust and confidence to further their
private interest in violation of the requirement of undivided
and unselfish loyalty to the Debtor[.]"  (Id. ¶¶ 196-203.)
Although GE is a Defendant in this action, it is not alleged to
maintain any type of fiduciary relationship with the Debtor.
Plaintiff does, however, assert that GE knowingly participated

in the underlying wrongful conduct by conspiring with the
Insider Defendants to arrive at the set purchase price and by
accepting a fee from Jermax conditioned on its consent to the
transfer.  (Id. ¶¶ 27, 66(f)-(g), 196-203.)  Jurista also
asserts that GE was aware that the Insider Defendants owed
fiduciary duties to the Debtor corporation.  Thus, it is evident
that Plaintiff has also satisfied the third element, and has
therefore successfully pled a claim for aiding and abetting a
breach of fiduciary duty with respect to Defendant GE.

The Court must next assess whether GE likewise aided and
abetted the facilitation of a fraudulent transfer.  In order to
establish such a claim under New Jersey law, a plaintiff must
fulfill the following elements: (1) the commission of a wrongful
act; (2) that the alleged aider-abettor had knowledge of the
act; and (3) the aider-abettor knowingly and substantially
participated in the wrongdoing.  In re Norvergence, Inc., 405
B.R. 709, 746 (Bankr. D.N.J. 2009) (citing Morganroth &
Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406,
415 (3d Cir.2003); Monsen v. Consol. Dressed Beef Co., Inc., 579
F.2d 793, 799 (3d Cir. 1978); Elysian Fed. Savings Bank v. First
Interregional Equity Corp., 713 F.Supp. 737, 760 (D.N.J. 1989)).

As to the first factor, the Insider Defendants are alleged
to have committed the wrongful act of unlawfully transferring

valuable equipment between Jermax and Amerinox in exchange for virtually no consideration.  (Compl. ¶¶ 26, 66(f), 191.)  The second element requires that the alleged aider-abettor to have knowledge of this wrongful act.  In his Complaint, Jurista avers that all the Defendants were aware of Jermax's precarious financial situation, but nonetheless executed the fraudulent scheme which pushed Jermax off the brink of insolvency into the vast canyon of bankruptcy.  (Id. ¶¶ 159, 163, 199-203.)  In fact, Plaintiff specifically states that "Defendant GE was fully aware of the distressed financial condition of the Debtor at or about the time that Defendant Amerinox established the purchase price for the transfer of the Debtor's assets to Defendant Amerinox."  (Id. ¶ 199.)  The second element therefore is also satisfied.  Finally, the third element requires the aider-abettor to knowingly and substantially participate in the wrongdoing.  Defendant GE is alleged to have participated in this fraud by conspiring with the individual Defendants to set an unreasonably low purchase price, consenting to the transfer, and accepting a fee in exchange for said consent.  (Id. ¶¶ 26-27, 66(f)-(g).)  Accordingly, the third element is also fulfilled.  The Court therefore finds that Plaintiff has likewise successfully pled his claim against Defendant GE for aiding and abetting a facilitation of a fraudulent transfer.

Accordingly, based on the above, Counts 21 and 22 will not be dismissed.  Since Amerinox and the individual Defendants are the principal actors alleged to committed the underlying wrongful acts, however, Plaintiff's aiding and abetting claims against them in Counts 15 and 16 fail as a matter of law and will therefore be dismissed for this reason.

### 8.   Count 17: Successor Liability

The well-recognized general rule of successor liability under New Jersey law provides that: "where one company sells or otherwise transfers all its assets to another company[,] the latter is not liable for the debts and liabilities of the transferor."  Portfolio Fin. Serv. Co. v. Sharemax.com, Inc., 334 F.Supp.2d 620, 624 (D.N.J. 2004) (citing Colman v. Fisher-Price, Inc., 954 F.Supp. 835, 838 (D.N.J. 1996); Ramirez v. Amsted Indus., Inc., 86 N.J. 332, 340 (1981); Luxliner P.L. Export Cp. v. RDI/Luxliner, 13 F.3d 69, 73 (3d Cir. 1993)); see also Dobin v. Taiwan Mach. Trade Ctr. Corp., 278 B.R. 67, 84 n.23 (Bankr. D.N.J. 2002); Glynwed, Inc. v. Plastimatic, Inc., 869 F.Supp. 265, 271 (D.N.J. 1994).  Four exceptions to the general rule of successor non-liability, however, have been recognized under New Jersey law:

> (1)If the parties have an express of implied agreement that the transferee will assume the liabilities of the transferor; (2) if the transferee was a "mere continuation" of the transferor; (3) if there was a

98

"de facto consolidation or merger" of the companies;
or (4) if the transfer was fraudulent.

<u>Dobin</u>, 278 B.R. at 84 n.23 (citing <u>Glynwed</u>, 679 F.Supp. at 271);

<u>Sharemax.com</u>, 334 F.Supp.2d at 624 (citing <u>Phila. Elec. Co. v.</u>

<u>Hercules, Inc.</u>, 762 F.2d 303, 308-09 (3d Cir. 1985); <u>Colman</u>, 954

F.Supp. at 838); <u>see also</u> <u>Ramirez</u>, 86 N.J. at 340-43.  In

instances of corporate merger or consolidation, the surviving

entity becomes liable for the joint obligations of both

corporations, even those liabilities which are considered to be

contingent, when the two corporations cease to independently

exist.  <u>Sharemax.com</u>, 334 F.Supp.2d at 624 (citing <u>Arch</u>, 984

F.Supp. at 841) (further citation omitted).  Moreover, in

instances of corporate acquisition, when a company acquires

another corporation and the target continues to operate as a

separate entity, the purchasing corporation will not assume the

liabilities of the acquired corporation unless it expressly

agrees to do so.  <u>Sharemax.com</u>, 334 F.Supp.2d at 624 (citing

<u>Arch v. Am. Tobacco Co.</u>, 984 F.Supp. 830, 841 (E.D. Pa. 1997))

(further citation omitted).

Prior to reaching the question of whether any of the above

exceptions applies to this case, the Court must first determine

if Aminox fits within the definition of a corporate successor

to Jermax.  In Count 17, Jurista alleges that Defendant Aminox

became Jermax's corporate successor as a result of the transfers

of equipment that occurred, and that Amerinox is thus liable for all of Jermax's debts, liabilities, and asset losses.  (Compl. ¶¶ 166-71.)  Specifically, Plaintiff argues that, after the transfer of equipment, the two companies effectively merged and Amerinox resurrected as the surviving entity of both corporations: "Defendant Amerinox is in the same business as the Debtor, continues the business of the Debtor, is owned by [the] same individuals as the Debtor, received assets and equipment of the Debtor, [and] operates from the same facility as the Debtor."  (Pl.'s Resp. Opp'n at 15.)

In order for principles of successor liability to even come into play, however, it must first be established that one company sold or otherwise transferred *all* of its assets to another company.  The word "all" is the operative word here.  In fashioning the law governing successor liability, the New Jersey Supreme Court explicitly included this word in its definition. See <u>Ramirez</u>, 86 N.J. at 340 ("The general principle has been accepted in New Jersey that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor.") (internal citations omitted).  It is unlikely that the state's highest court did so accidentally.  Indeed, Plaintiff has not cited to, nor has the Court through its own research found, any

100

New Jersey Supreme Court decision indicating that the sale or transfer of *some* of a company's assets could amount to successor liability.[38]  The rationale behind the requirement that a successor corporation obtain all of another corporation's assets for purposes of successor liability is apparent: if several corporations purchase some of a selling corporation's assets, it becomes a legal thicket to ascertain which purchaser was successively liable for what degree of the seller's debts and liabilities.

Here, Jurista does not aver that Jermax transferred all of its assets to Amerinox, but instead alleges that it merely transferred certain assets — notably, valuable processing equipment — to it.  On their part, Defendants point to instances in which Jermax sold or transferred some of its assets to an entity other than Amerinox.  For example, on April 11, 2011, the

---

[38]    It is worth noting that, in the context of successor liability related to product liability claims, New Jersey courts have previously recognized that "where one corporation acquires all or *substantially all* the manufacturing assets of another corporation . . . and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line." Potwora *ex rel.* Gray v. Grip, 725 A.2d 697, 705 (N.J. Super. 1999) (citing Ramirez, 431 A.2d at 811) (emphasis added).  The "substantially all" language has not been utilized by New Jersey courts with respect to non-product liability asset transfer successor liability claims.  Even if it was, however, Plaintiff has not indicated that the equipment transferred from Jermax to Amerinox constituted substantially all of Jermax's assets.

Bankruptcy Court approved the sale of a substantial portion of
Jermax's inventory to Samuel, Son & Co., Inc. [Bankr. Docket
10-29397(GMB); No. 131.]  Similarly, on April 19, 2011, the
Bankruptcy Court also approved the sale of Jermax's customer
lists to Samuel, Son & Co., Inc. [Bankr. Docket 10-29397(GMB);
No. 139.]  These asset sales cut against a finding that Jermax
transferred all of its assets to Amerinox.  Plaintiff offers no
evidence or argument of its own to rebut this point, but rather
responds that "[t]he Insider Defendants left behind a corporate
shell with a paucity of assets for creditors to pick over in
Bankruptcy Court."  (Pl.'s Resp. Opp'n at 15.)  By its own
words, this statement acknowledges that Amerinox did not assume
all of Jermax's assets, as property remained in the Debtor's
estate to be distributed and sold post-petition.

    Moreover, the theory of Plaintiff's successor liability
claim is that Amerinox and Jermax effectively merged as a result
of the asset transfers.  As indicated above, however, when one
company acquires another corporation and the target corporation
continues to operate as a separate entity, the purchasing
corporation does not assume the liabilities of the acquired
corporation.  Based on the instant record before it, it is not
clear to the Court whether a corporate merger or acquisition
occurred under these circumstances.  In any event, the record

does indicate that Jermax continued to operate as a separate entity after the equipment transfers.  Indeed, Jermax filed for bankruptcy protection, while Amerinox, as far as the record reveals, continues to operate as an independent business.  Thus, the fact that both companies survived post-asset transfer further cuts against the central premise of Plaintiff's successor liability argument.

Plaintiff's successor liability claim therefore fails at the threshold inquiry because Jurista has not established that Jermax sold or otherwise transferred all of its assets to Amerinox such that the latter could be liable for all of the Debtor's debts, liabilities, and asset losses.  Thus, the Court need not consider whether any of the four exceptions apply under these circumstances.  Accordingly, Jurista's successor liability claim shall be dismissed from suit.

### 9.  Count 18: Piercing the Corporate Veil

Under both state and federal common law, abuse of the corporate form allows courts to employ the "tool of equity" known as veil-piercing.  "The 'classical' piercing of the corporate veil is an equitable remedy whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation."  Trs. of the Nat'l Elevator Indus.

103

Pension, Health, Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 192 (3d Cir. 2002) (citing In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999); Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002); Publicker Indus., Inc. v. Roman Ceramics Corp., 603 F.2d 1065, 1069 (3d Cir. 1979)).  The doctrine essentially permits a "charge of derivative liability" against the person or entity controlling the corporation.  Lutyk, 332 F.3d at 192 (citing United States v. Bestfoods, 524 U.S. 51, 64 (1998)).  "As 'an equitable remedy,' piercing the corporate veil is not technically a mechanism for imposing 'legal' liability, but [rather] for remedying the 'fundamental unfairness that will result from a failure to disregard the corporate form.'"  Lutyk, 332 F.3d at 193 n.6 (internal citations omitted).  The Third Circuit has found that veil-piercing is appropriate in instances of fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield individuals from criminal liability.  Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967); see also Portfolio Fin. Servs. Co. v. Sharemax.com, 334 F.Supp.2d 620, 625 (D.N.J. 2004).  The doctrine also applies in cases where the corporation is alleged to be a sham or façade that shields individual officers, directors, or shareholders from liability, or where the corporation operated as a mere alter ego of the corporate officers.  Rittenhouse & Lee v.

Dollars & Sense, Inc., No.Civ.A.83-5996, 1987 WL 9665, at *6 (E.D. Pa. Apr. 15, 1987) (internal citation omitted) (Scirica, J.).

In New Jersey, two overarching elements must first be satisfied prior to piercing the corporate veil: (1) there must be such a unity of interest and ownership that the separate personalities of the corporation and the individual cease to exist; and (2) the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.   Mall at IV Grp. Props., LLC v. Roberts, No.Civ.A.02-4692, 2005 U.S. Dist. LEXIS 31860, at *8 (D.N.J. Dec. 8, 2005) (internal citations omitted).   In ascertaining whether the veil shrouding corporate individuals from liability should be pulled back, the Third Circuit has instructed the district courts to consider the presence of the following factors, commonly recognized as the "Pearson factors":

> (1) Gross undercapitalization of the corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of a debtor corporation; (5) siphoning of funds from the debtor corporation by the dominant stockholder; (6) nonfunctioning of corporate officers and directors; (7) absence of corporate funds; and (8) whether the corporation is merely a façade for the operations of the dominant stockholder.

Pearson v. Component Tech. Corp., 247 F.3d 471, 484-85 (3d Cir. 2000).

In the instant case, it is alleged that individual
Defendants Young, Carter, and Gerwitz were the sole
shareholders, officers, and directors of Debtor Jermax and
presently hold the same titles at Defendant Amerinox.  (Compl.
¶¶ 8-10, 173-75.)  Given their controlling positions at both
companies, Plaintiff avers that they abused the corporate form
in an effort to commit fraud and further their personal
interests.  (Id. ¶¶ 173-75.)  Plaintiff thus argues that the
Court should allow him to pierce the corporate veil to hold the
individual Defendants liable for their allegedly fraudulent
conduct.

     As an initial matter, Plaintiff has not specified whether
he seeks to pierce the corporate veil of Debtor Jermax,
Defendant Amerinox, or both corporations.[39]  On the one hand, it
appears from certain portions of the Complaint — particularly
Jurista's attempt to hold Amerinox successively liable for

---

[39]     Indeed, Count 18 could also be interpreted as seeking to
pierce the corporate veil of Defendant GE, as Plaintiff seeks
judgment in his favor on this claim against "the Defendants."
Plaintiff has not, however, established any basis for why he
should be permitted to pierce GE's corporate veil.  There are no
allegations in the Complaint that GE has any controlling
interest in either the Debtor or Amerinox, or that it used the
corporate form of these corporations as a façade for its own
fraudulent conduct.  Indeed, the only relationship GE maintained
with Jermax was a debtor-creditor relationship based on its loan
agreement.  As such, to the extent that Plaintiff meant to
assert his veil-piercing claim in Count 18 against Defendant GE,
such a claim will be dismissed from suit.

Jermax's debts and outstanding liabilities in Count 17 — that Plaintiff desires to pierce Amerinox's corporate veil.  On the other hand, different sections of Plaintiff's Complaint and the context of his Response in Opposition appear to indicate that he wishes to pierce Jermax's corporate veil.  Still at other points, Plaintiff appears to be requesting permission to pierce the corporate veil of both corporations: "[b]y virtue of their position as owners, officers, directors and/or controlling employees of the Debtor and Defendant Amerinox, Defendants Robert Carter, Seth Young and Arthur Gerwitz used said corporate entities as alter egos.  The control these Defendants . . . exercised over the Debtor and Defendant Amerinox involved their appropriating the assets of the Debtor for the own benefit[.]" (Id. ¶¶ 173-74.)  At this stage of proceedings, the Court is required to view the Complaint in the light most favorable to Plaintiff.  As such, out of an abundance of caution, the Court will presume that Plaintiff attempts to pierce the corporate veil of both corporations.[40]

---

[40]   Although the Court presently affords Plaintiff the benefit of the doubt, he is cautioned to be more specific in future filings, particularly in light of the fact that permission to pierce the corporate veil is a discouraged remedy that should be utilized cautiously and only under extraordinary circumstances. See Sharemax.com, 334 F.Supp.2d at 627 (internal citations omitted); A&F Corp. v. Brown, No.Civ.A.94-4709, 1996 WL 466909, at *4 (E.D. Pa. Aug. 15, 1996) (internal citations omitted).

As set forth above, a plaintiff must satisfy two
overarching elements prior to piercing the corporate veil of a
corporation.  The first element is that "there must be such
unity of interest and ownership that the separate personalities
of the corporation and the individual no longer exist."
Roberts, 2005 U.S. Dist. LEXIS 31860 at *8.  Put differently,
"the controlled corporation acted robot or puppet-like in
mechanical response to the controller's tugs on its strings or
pressure on its buttons."  Gateco, Inc. v. Safeco Ins. Co. of
Am., No.Civ.A.05-2869, 2006 U.S. Dist. LEXIS 50313, at *7 (E.D.
Pa. July 24, 2006) (internal citation omitted).[41]  Here, Jurista
avers that Defendants Carter, Young, and Gerwitz were the sole
shareholders, officers and directors of both Jermax and Amerinox
and controlled all decisions affecting the companies.  (Compl.
¶¶ 173-75.)  The second necessary element is that "the
circumstances must indicate that adherence to the fiction of
separate corporate existence would sanction a fraud or promote
injustice."  Roberts, 2005 U.S. Dist. LEXIS 31860 at *8.
Jurista further asserts that, by virtue of their controlling
positions at both corporations, the individual Defendants
operated Jermax and Amerinox as "instruments" that furthered
their personal interests and perpetuated a fraud.  (Compl. ¶¶

---

[41]   Although Gateco addressed a veil-piercing claim brought
under Pennsylvania law, the same principle applies to this case.

173-75.)  Thus, Plaintiff has satisfied the two "gateway" elements of a veil-piercing claim.

The Court next considers whether any of the <u>Pearson</u> factors set forth by the Third Circuit are present here to justify the actual piercing of the veil.  The Court finds that Plaintiff has sufficiently pled the presence of several of these factors.  For example, Plaintiff repeatedly asserts throughout his Complaint that the individual Defendants caused Jermax to be grossly undercapitalized and maintained unreasonably small capital on hand to pay its bills.  (<u>Id.</u> ¶¶ 42-63.)  As a result of this gross undercapitalization, Jermax was unable to pay its debts as they became due and defaulted on several of its loans.  (<u>Id.</u>)  Jurista further maintains that the individual Defendants solely operated Jermax for the benefit of Amerinox, and failed to observe proper corporate formalities in doing so.  Specifically, Jermax paid officer salaries, administrative wages, health insurance, rent, and utility costs that should have been paid by Amerinox.  (<u>Id.</u> ¶¶ 21, 66.)  These allegations further lend to a finding that the companies operated as a mere façade or sham to shield the fraudulent conduct of the individual Defendants.  Furthermore, as has been repeatedly recognized throughout this Opinion, Plaintiff asserts that Jermax became insolvent and eventually entered bankruptcy as a result of the Defendants'

conduct.  (Id. ¶¶ 36, 38-41, 71, 76, 122.)  As such, prior to
taking discovery, Plaintiff has initially pled the existence of
several Pearson factors that would justify a piercing of the
corporate veil under these circumstances.

It is also worth mentioning that the Third Circuit has
expressly recognized that veil-piercing is appropriate in
instances of fraud, illegality, or injustice.  Zubik, 384 F.2d
at 272.  As discussed in detail above, Jurista has successfully
pled the existence of fraud or fraudulent conduct in Counts 2,
3, 4, 9, 10 and 11.  This therefore further substantiates a
finding that dismissal of Plaintiff's veil-piercing claim would
be inappropriate at this time.  Accordingly, based on the above,
Defendants' request to dismiss Count 18 will be denied.

### 10.  Count 19: Misappropriation of Assets, Trade Secrets, Proprietary Information and Other Assets[42]

In Count 19, Plaintiff argues that Defendants allegedly
misappropriated Jermax's assets, trade secrets, and proprietary
information.[43]  Defendants, on the other hand, aver that

---

[42]   At points throughout Count 19, Plaintiff seeks an
injunction to enjoin "all Defendants" from engaging in certain
conduct.  The Court will therefore presume that Plaintiff meant
to bring this claim against Defendant GE as well.

[43]   Defendants have moved to dismiss Count 19 pursuant to
Federal Civil Rule 12(b)(6) on the grounds that Plaintiff has
failed to state a claim upon which relief can be granted.  In
Count 19, Plaintiff also seeks myriad injunctive relief related

Plaintiff's allegations in this Count amount to nothing more than specious claims lacking sufficient factual support.

A misappropriation claim brought in federal court is governed by state — not federal — common law.  Rohm & Haas Co. v. Adco Chem. Co., 689 F.2d 424, 429 (3d Cir. 1982) ("A trade secret claim in the federal courts is governed not by federal common law but by state law.  This is true regardless of whether jurisdiction is based upon diversity of citizenship[.]").  In New Jersey, in order to prevail on a misappropriation claim, the owner of the allegedly misappropriated information must establish the following six elements:

> (1) A trade secret exists; (2) the information comprising the trade secret was communicated in confidence by plaintiff to the employee; (3) the secret information was disclosed by that employee and in breach of that confidence; (4) the secret information was acquired by a competitor with knowledge of the employee's breach of confidence; (5) the secret information was used by the competitor to

---

to the Defendants' alleged misappropriation of Jermax's assets, trade secrets, and proprietary information.  In conjunction with his Response in Opposition to Defendants' Motion to Dismiss, Plaintiff also filed a Cross-Motion for Imposition of Prejudgment Temporary Restraints Against Transfers by the Defendants based his allegations in Count 19.  As such, Count 19 is the subject of both Defendants' Motion to Dismiss and Plaintiff's Cross-Motion for Imposition of Prejudgment Temporary Restraints.  In this section of the Opinion, the Court only addresses whether Plaintiff has satisfied the standards of Rule 12(b)(6) in order to survive dismissal.  As to Plaintiff's sought injunctive relief, the Court considers this issue separately in its analysis of Plaintiff's Cross-Motion, infra.

the detriment of plaintiff; and (6) the plaintiff took precautions to maintain the secrecy of the trade secret.

Telmark Packaging Corp., Inc. v. Nutro Labs. & Nature's Bounty, No.Civ.A.05-3049, 2008 U.S. Dist. LEXIS 45, at *14 (D.N.J. Jan. 2, 2008) (citing Rycolene Prods., Inc. v. Walsh, 756 A.2d 1047 (N.J. Super. 2000)) (further citation omitted).  A trade secret may be "any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  Rohm, 689 F.2d at 431 (quoting Restatement of Torts (Second) § 757 *comm. b* (1939)).  Moreover, in order to successfully establish a misappropriation claim, the moving party bears the burden of proving that the allegedly misappropriated information is secret and not a matter of general knowledge within the industry.  Rohm, 689 F.2d at 431-32.

Plaintiff's Complaint is noticeably devoid of any factual support to satisfy a misappropriation claim under New Jersey law.  At no point in the twenty-four count pleading does he ever identify or define what trade secrets or proprietary information belonging to Jermax were allegedly misappropriated by Defendants.  Nor does Plaintiff clarify his claim in his Response in Opposition, but rather merely cursorily alleges that ¶¶ 20-37 of his Complaint describe the assets that were

112

misappropriated by Defendants.  (Pl.'s Resp. Opp'n at 16.)
These paragraphs in Plaintiff's pleading, however, describe
allegedly fraudulently transferred equipment and certain
payments improperly made by Jermax on behalf of the Defendants.
At no point in this section of the pleading does Plaintiff
allege that these "assets" constitute misappropriated trade
secrets or proprietary information.

Moreover, even if the Court were to afford an extremely
liberal reading to this section of Plaintiff's Complaint and
find that these transactions equated to trade secrets or
proprietary information (which they do not), Plaintiff
nonetheless fails to establish the remaining five elements of a
misappropriation claim — *i.e.*, that the information was
communicated in confidence to Defendants; that Defendants
disclosed the information in breach of that confidence; the
information was acquired by a competitor with knowledge of the
the breach of confidence; and that Jermax took precautions to
maintain the secrecy of that information.  In the entirety of
the thirty-seven page Complaint, there is not a shred of factual
support for these elements.  As such, Plaintiff has wholly
failed to state a misappropriation claim upon which the Court
can enter relief, and Count 19 shall be dismissed.

## 11.  Count 20: Constructive Trust

"A constructive trust is the formula through which the conscience of equity finds expression.  When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest[,] equity converts him into a trustee." Flanigan v. Munson, 175 N.J. 597, 608 (N.J. 2003) (quoting Beatty v. Guggenheim Exploration Co., 122 N.E. 378, 386 (1919) (Cardozo, J.)).  Indeed, the entire premise of a constructive trust is to "prevent unjust enrichment and force a restitution to the plaintiff of something that in equity and good conscience [does] not belong to the defendant." Flanigan, 175 N.J. at 608.  In New Jersey, a two-pronged test is utilized to determine whether a constructive trust is warranted in a given case. Id.  First, the defendant must have committed a "wrongful act." Id. Second, that wrongful act must have resulted in a transfer or diversion of property that unjustly enriches its recipient. Id. (internal citations omitted).  The New Jersey Supreme Court, however, has expressly cautioned that "a constructive trust is a powerful tool to be used only when the equities in a given case clearly warrant it." In re Allen, Bankr.No.874, 2012 U.S. Bankr. LEXIS 874, at *43 (citing D'Ippolito v. Castoro, 51 N.J. 584, 589 (N.J. 1968)).  "Thus, the suitability of imposing a constructive trust must be established by the movant by 'clear,

114

definite, unequivocal and satisfactory evidence.'" <u>Allen</u>, 2012
U.S. Bankr. LEXIS 874 at *43-44 (quoting <u>Gray v. Bradley</u>, 1 N.J.
102, 104 (1948)).

Although Plaintiff is likely to satisfy the wrongful act
element, his constructive trust claim must fail because he
cannot sufficiently establish the prerequisite of unjust
enrichment.  The Court, in fact, already dismissed Plaintiff's
unjust enrichment claim in Count 6, <u>supra</u>.  "[T]he touchstone of
the constructive trust doctrine is unjust enrichment." <u>Allen</u>,
2012 U.S. Bankr. LEXIS 874 at *46 (citing <u>First Interregional
Advisors Corp. v. Golding</u>, 218 B.R. 722, 723 (Bankr. D.N.J.
1997) (further citation omitted).  Without this touchstone,
Plaintiff cannot successfully architect his constructive trust
claim.

This Court also notes that other courts have generally been
averse to impose constructive trusts in the bankruptcy context
due to "the potentially uneasy interaction between federal and
state law" in such instances.  See <u>Allen</u>, 2012 U.S. Bankr. LEXIS
874 at *38 (citing <u>In re Haber Oil</u>, 12 F.3d 426, 436 (5th Cir.
1994); <u>Neochem Corp. v. Behring Int'l Ins.</u>, 61 B.R. 896, 902
(Bankr. N.D. Tex. 1986); <u>Torres v. Eastlick</u>, 767 F.2d 1573, 1575
(9th Cir. 1985); <u>In re Pemaquid Underwriting Brokerage, Inc.</u>,
319 B.R. 824, 844 (Bankr. D.N.J. 2005); <u>In re Leedy Mortg. Co.</u>,

Inc., 111 B.R. 488, 494 (Bankr. E.D. Pa. 1990); In re Sacred

Heart Hosp. of Norristown, 175 B.R. 543 (Bankr. E.D. Pa. 1994);

In re Omegas Grp., Inc., 16 F.3d 1443 (6th Cir. 1994)).

Essentially, "[b]ecause the constructive trust doctrine can

wreak havoc with the priority system ordained by the Bankruptcy

Code, bankruptcy courts are generally reluctant to 'impose

constructive trusts without a substantial reason to do so.'"

Neochem Corp., 61 B.R. at 902.  Rather than engage in a lengthy

discussion of the interplay of state and federal bankruptcy law

in this context and discuss the intricacies involved with such

claims, the Court merely references this point as further

indication for why a constructive trust should not be imposed

under these circumstances.

    As such, based on the above, the Court finds that Plaintiff

cannot sufficiently establish a constructive trust claim.

Accordingly, Count 20 will likewise be dismissed from suit.

### 12.  Count 23: Avoidance of Post-Petition Transfers[44]

    In Count 23, Jurista avers that he is authorized to avoid

the transfers that occurred between Jermax and the Defendants

---

[44]    In Count 23, Plaintiff states that "Defendants have
misappropriated and transferred assets" that rightfully belong
to the Debtor.  He has not, however, specifically identified the
Defendants to whom he refers.  Thus, given this rather broad
language, the Court will presume that Plaintiff meant to bring
Count 23 against Defendant GE as well.

under § 549 of the Bankruptcy Code.  (Compl. ¶¶ 205-06.)
Defendants, on the other hand, contend that Count 23 fails as a
matter of law because Plaintiff's allegations do not fall within
the ambit of that statutory section.

Under § 549, a bankruptcy trustee may avoid a post-petition
transfer of property of the bankruptcy estate that is not
authorized by any provision of the Bankruptcy Code or by order
of the bankruptcy court.  In re Forman Enter., 273 B.R. 408, 414
(Bankr. W.D. Pa. 2002).  "To the extent such a transfer is so
avoided, the trustee may recover from the initial transferee the
property transferred or its value."  Id.  Section 549 of the
Bankruptcy Code provides, in relevant part, as follows:

> [T]he trustee may avoid a transfer of property of
> the estate--
>
>> (1) that occurs after the commencement of the
>> case; and
>>
>> (2)(A)that is authorized only under section
>> 303(f)[45] or 542(c)[46] of this title; or (B) that

---

[45]   This statutory section provides: "[E]xcept to the extent
that the court orders otherwise, and until an order for relief
in the case, any business of the debtor may continue to operate,
and the debtor may continue to use, acquire, or dispose of
property as if an involuntary case concerning the debtor had not
been commenced."  11 U.S.C. § 303(f).

[46]   This statutory section provides: "[A]n entity that has
neither actual notice nor actual knowledge of the commencement
of the case concerning the debtor may transfer property of the
estate, or pay a debt owing to the debtor . . . to an entity
other than the trustee, with the same effect as to the entity

is not authorized under this title or by the
court.

11 U.S.C. § 549(a).  In order to prevail on a claim brought
under this section, the following four prerequisites must be
satisfied: (1) a transfer occurred; (2) what was transferred was
property of the bankruptcy estate when it occurred; (3) the
transfer occurred after the bankruptcy case had commenced; and
(4) the transfer was not authorized by the Bankruptcy Code or
the bankruptcy court.  In re Owens, 379 B.R. 558, 564 (Bankr.
W.D. Pa. 2007).

In the instant case, Jurista fails to even identify the
four elements of a § 549 claim, let alone satisfy them.  While
he asserts that several allegedly fraudulent transfers took
place between Jermax and the Defendants, he has not articulated
that the subject property actually belonged to Jermax's
bankruptcy estate at the time it was transferred, as is required
by the second element.  Indeed, this cannot be established
because Jermax was not yet in bankruptcy when the alleged
transfers occurred.  More specifically, all of the alleged
fraudulent transfers took place in 2008 and 2009, but Jermax did
not file its Chapter 11 bankruptcy petition until June 24, 2010.

making such transfer or payment as if the case under this title
concerning the debtor had not been commenced."  11 U.S.C. §
542(c).

(Compl. ¶¶ 23, 26, 30, 34, 38-62, 66(a)-(j).)  As such, Jurista likewise cannot establish the third element, *i.e.*, that the transfer occurred after the bankruptcy commenced.  Thus, his § 549 claim fails as a matter of law, and Count 23 will be dismissed from suit.

### 13.  Count 24: Avoidance and Recovery of Transfers to Mediate and Immediate Transferees[47]

Count 24 of Plaintiff's Complaint appears to be a summary, "catch-all" claim.  Although Plaintiff spends the vast majority of Count 24 arguing why the asset transfers between Jermax and the Defendants can be avoided under ¶ 550 of the Bankruptcy Code, (Id. ¶¶ 208-211), he also cursorily states that: "[t]he payments received by Defendants as described throughout this Complaint can be avoided and recovered for the benefit of the above captioned bankruptcy estate[] in accordance with Sections 544, 547, 548, 549, 550, and 551 of the Bankruptcy Code."  (Id. ¶ 208.)

The Court already addressed the merit of Plaintiff's claims brought pursuant to Bankruptcy Code §§ 548 and 549 in its above Discussion.  It will not repeat this discussion again here, but

---

[47]   Once again, Plaintiff generally refers to "Defendants" in Count 24 of his Complaint.  As indicated above, Count 24 appears to be a "catch-all" claim that references other counts in the Complaint.  To the extent that the Court already determined that Plaintiff meant to assert any of these allegations against Defendant GE, they will likewise not be dismissed in Count 24.

rather directs the parties' attention to the other sections of this Opinion discussing these statutory provisions.

With respect to Plaintiff's allegations brought pursuant to § 551, the Court notes that this statutory section merely preserves for the benefit of the debtor's bankruptcy estate the property of a transfer made avoidable by other sections of the Code: "Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title . . . is preserved for the benefit of the estate but only with respect to property of the estate."  11 U.S.C. § 551.  Stated differently, § 551 serves as a "follow-up" provision explaining how assets and property avoided under other Code provisions should be handled.  Thus, to the extent that Plaintiff has successfully pled that the transfers at issue should be avoided under another Code section, § 551 would "preserve" the assets that are the subject matter of those transfers for the benefit of Jermax's bankruptcy estate.

The Court next considers Plaintiff's claims brought under § 544.  Generally, a bankruptcy trustee or other representative of the estate does not have standing to represent the interests of third party creditors in bankruptcy proceedings because the trustee, as the entity standing in the shoes of the debtor, "can only assert claims which the corporation could have asserted." In re D.H. Overmyer Telecasting Co., 56 B.R. 657, 661 (N.D. Oh.

1986) (citing <u>Caplin v. Marine Midland Grace Tr. Co.</u>, 406 U.S. 416, 429 (1972)) (further citation omitted).  As discussed above in the section of this Opinion related to standing, Section 544 of the Bankruptcy Code is an exception to this rule.  That statutory section "grants the trustee the same rights as any unsecured creditor to avoid transfers under applicable state law."[48]  <u>In re G-I Holdings, Inc.,</u> 313 B.R. 612, 632 (Bankr.

---

[48]    Section 544 states in full, as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by--

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(b) (1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the

D.N.J. 2004) (citing In re Halpert & Co., 254 B.R. 104, 122

(Bankr. D.N.J. 1999); In re DLC, Ltd., 295 B.R. 593, 601 (B.A.P.

8th Cir. 2003)) (parentheticals omitted).  Section 544 does not,

however, allow a bankruptcy trustee or other estate

representative to pursue every state law action that a creditor

might pursue.  See In re Fedders N. Am., Inc., 405 B.R. 527, 548

(Bankr. D. Del. 2009) (internal citation omitted).  Rather, the

representative is limited to pursuing causes of action that the

Bankruptcy Code expressly allows him to pursue.  Id.  Thus,

while the representative may avoid a transfer under § 544

because the Code expressly grants him this authority, he may not

directly assert claims for damages under state law on behalf of

the debtor's creditors pursuant to this statutory section.  Id.

    In the instant case, Plaintiff relies on § 544 to some

degree in Counts 2, 4, 9, and 11 to avoid the alleged fraudulent

transfers that occurred between Jermax and the Defendants that

allegedly significantly injured the Debtor and its creditors.

Jurista does not rely on § 544 as the basis for any of his state

law causes of action for damages, but rather solely relies on it

---

    debtor that is voidable under applicable law by a
    creditor holding an unsecured claim that is allowable
    under section 502 of this title or that is not
    allowable only under section 502(e) of this title. (2)
    Paragraph (1) shall not apply to a transfer of a
    charitable contribution[.]

11 U.S.C. § 544.

as a basis for avoiding the transfers.  The Bankruptcy Code
expressly grants Jurista this avoidance power.  As such, he is
permitted to rely on this statutory section in connection with
his avoidance claims.[49]

The primary focus of Jurista's claim in Count 24 is on §
550 of the Bankruptcy Code.  Section 550 of the Bankruptcy Code
authorizes the representative to recover fraudulently
transferred property.  "The representative of a bankruptcy
estate, generally a trustee, has broad powers under the
Bankruptcy Code to 'avoid' certain transfers of property made by
the debtor either after or shortly before the filing of the
bankruptcy petition.  The property may be returned to the estate
for the benefit of all persons who have valid claims against the
debtor."  In re Bullion Reserve of N. Am., 922 F.2d 544, 546
(9th Cir. 1991).  Specifically, to the extent a transfer is
deemed avoided under §§ 544, 545, 547, 548, 549, 553(b) or
724(a) of the Code, § 550 authorizes the debtor's representative
to recover, for the benefit of the estate, the transferred
property or its corresponding value from the entity for whose

---

[49]    The Court notes that Defendant GE argues that § 544(b) does
not permit the Disbursing Agent to pursue the aiding and
abetting claims asserted against it.  The Court previously
addressed this argument in the section of this Opinion related
to standing, supra, and will not do so again here.

benefit the transfer was made.[50]  Halpert, 254 B.R. at 116

(citing 11 U.S.C. § 550(a)(1)) (internal quotations omitted).

"Theoretically, the trustee can recover from both the initial

transferee and any secondary transferee, as well as from any

entity for whose benefit the initial transfer was made."

Bullion Reserve, 922 F.2d at 546-47.

Relying on their earlier arguments made regarding the

dismissal of Counts 1, 2, 3, 4, and 8, Defendants argue that

Plaintiff's § 550 claim fails because Plaintiff cannot establish

that the underlying transfers are avoidable.  The Court,

however, already addressed these counts and determined that

Plaintiff has satisfactorily alleged that some of the transfers

may be avoidable under § 548 of the Bankruptcy Code.  At this

preliminary stages of the proceedings, Jurista need not

establish that he will ultimately prevail on these claims, but

---

[50]     Section 550 states more fully as follows:

Except as otherwise provided in this section, to the
extent that a transfer is avoided under section 544,
545, 547, 548, 549, 553(b), or 724(a) of this title,
the trustee may recover, for the benefit of the
estate, the property transferred, or, if the court so
orders, the value of such property, from—
        (1) the initial transferee of such transfer or
        the entity for whose benefit such transfer was
        made; or
        (2) any immediate or mediate transferee of such
        initial transferee.

11 U.S.C. § 550(a).

rather need only allege enough for the Court to find that he can
proceed forward with them.  Thus, to the extent that these
transfers may ultimately be determined to be avoidable under §
548, § 550 would permit Jermax's representative to recover this
property or its corresponding value from the Defendants for the
benefit of the bankruptcy estate.  Accordingly, to the extent
Plaintiff relies on § 550, the Court will not dismiss any such
claims.

Finally, the Court considers Plaintiff's assertion that the
transfers at issue in this case can be avoided under § 547 of
the Bankruptcy Code.  This is the first and only time in his
thirty-seven page long pleading that Plaintiff has referenced
this section of the Code.  More so, Plaintiff merely lists it
amongst a plethora of other Code provisions in ¶ 208, in a
section of his pleading otherwise completely focused on § 550.
He does not define § 547 or identify the subsection upon which
he bases his claim, let alone provide any factual support or
explanation for why any transfers should be avoided under it.
He also makes no attempt to clarify his position with respect to
this statute in his Response in Opposition.  "Although the
Federal Rules of Civil Procedure do not require a claimant to
set forth an intricately detailed description of the asserted
basis for relief, they do require that the pleadings give

defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149-50 n.3 (1984) (quotation & citation omitted).  At a minimum, a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Merely listing a statutory provision amongst a host of other statutes in one short paragraph of a complaint does not satisfy this standard. Accordingly, to the extent Plaintiff seeks to base any of his claims on § 547, he has failed to state a claim upon which relief can be granted.

## IV.  THE CROSS-MOTION FOR IMPOSITION OF PREJUDGMENT TEMPORARY RESTRAINTS AGAINST TRANSFERS BY DEFENDANTS AMERINOX, CARTER, YOUNG, AND GERWITZ

In Count 19, Plaintiff alleges that Defendants misappropriated Jermax's assets, trade secrets, and proprietary information.[51]  In addition to seeking damages for this claim,

---

[51]    In this count, Plaintiff seeks myriad injunctive relief related to the Defendants' alleged misappropriation of Jermax's assets, trade secrets, and proprietary information.  As discussed above, Defendants moved to dismiss the merits of Count 19 pursuant to Federal Civil Rule 12(b)(6) on the grounds that Plaintiff's misappropriation claim fails as a matter of law.  In response, Plaintiff filed the instant Cross-Motion for Imposition of Prejudgment Temporary Restraints Against Transfers by the Defendants based on his allegations in Count 19.  Count 19 is therefore the subject of both Defendants' Motion to Dismiss and Plaintiff's Cross-Motion for Imposition of Prejudgment Temporary Restraints.  The Court already addressed the merits of Plaintiff's claims in Count 19 in its above Discussion, supra.  In this section of the Opinion, the Court

Plaintiff also seeks preliminary restraints against the Defendants based on their alleged misappropriation of the Debtor's proprietary information and trade secrets.  More specifically, Plaintiff requests the Court to enter an injunction: (1) enjoining Defendants and their employees from having any further contact with Jermax's accounts and customers; (2) enjoining Defendants from utilizing any of Jermax's assets referenced in the February 2009 Transfer Agreement; (3) ordering Defendants to return all of Jermax's assets to Plaintiff for the benefit of the Debtor and its creditors; (4) ordering Defendants to disgorge any unfilled orders taken from Jermax's customers and all monies and gross profits from all customer sales related to Jermax's sales accounts; and (5) enjoining Defendants from further utilizing the names "Jermax" and "Gulf and Northern" in any new business ventures. (Compl. ¶¶ 179(1)-(5).)

Preliminary injunctions are extraordinary remedies that are not routinely granted.  Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004).  The decision to grant a preliminary injunction is within the sound discretion of the district court.  eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006); Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1334 (Fed. Cir. 2006); Amazon.com, Inc. v.

only considers whether the injunctive relief Plaintiff seeks in this count would be appropriate under the circumstances.

Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).[52]

The Court examines the following four factors in determining whether injunctive relief is appropriate in a given case:

> (1)  Whether the movant shows a reasonable likelihood of success on the merits;
>
> (2)  Whether the movant will be irreparably harmed by denial of the injunctive relief sought;
>
> (3)  Whether the injury to the movant in the absence of injunctive relief outweighs the possible harm to the non-movant if the injunction is granted; and
>
> (4)  The impact of a preliminary injunction on the public interest.

Abbott Labs., 452 F.3d at 1334.  The movant bears the burden of demonstrating that the injunction it seeks should issue, and "cannot be granted a preliminary injunction unless it establishes both of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm."  Amazon.com, 239 F.3d at 1350.  The Court, however, must generally weigh all four factors in making its determination.  See id.  Indeed, our Court of Appeals has previously recognized that "an injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief."  Conestoga Wood Specialties Corp. v. Sec'y of U.S. Health & Human Servs., App.No.13-1144, 2013 U.S. App.

---

[52]  Applications for temporary restraining orders are governed by the same standards as motions for preliminary injunctions. See Westchester Fire Ins. Co. v. Global Real Constr., LLC, No.Civ.A.09-207, 2009 LEXIS 3481, at *5 (D.N.J. Jan. 20, 2009).

LEXIS 2706, at *4 (3d Cir. Feb. 7, 2013) (citing N.J. Hosp. Ass'n v. Waldman, 73 F.3d 509, 512 (3d Cir. 1995)).  Further, in the bankruptcy context, § 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]."  11 U.S.C. § 105(a).  This includes the ability to award injunctive relief under appropriate circumstances.  See In re W.R. Grace & Co., 475 B.R. 34 (D. Del. 2012).

### A.   Likelihood of Success on the Merits

In order to obtain an injunction, Plaintiff must first establish that he is likely to prevail on the merits of his claims.  Successful establishment of this first factor has been recognized to be of primary importance in receiving injunctive relief.  See Ball v. Beard, No.Civ.A.09-845, 2010 U.S. Dist. LEXIS 1884, at *7 (M.D. Pa. Jan. 11, 2010) (citing Am. Tel. & Tel. Co. v. Winback & Conserve Prog., Inc., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).  To show a likelihood of success on the merits, the moving party must produce "sufficient evidence" to satisfy the essential elements of the underlying cause of action.  See Conestoga, 2013 U.S. App. LEXIS 2706 at *4; Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980); McCahon v. Pa. Tpk. Comm'n, 491 F.Supp.2d 522, 527 (M.D. Pa. 2007).  Further, in ascertaining whether success is likely, the court should consider the legal principles controlling the claim, as well as

any potential defenses available to the opposing party in rendering its decision.  See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000).

Jurista seeks injunctive relief on the basis that "Defendants Amerinox, Carter, Young and Gerwitz have misappropriated and are continuing to misappropriate Debtors' [*sic*] assets [and] Debtor and its creditors have suffered and will continue to suffer irreparable harm as a result of Defendants' conduct." (Compl. ¶¶ 178-79.)  The Court previously considered Jurista's misappropriation claim in its above Discussion of Defendants' Motion to Dismiss brought pursuant to Federal Civil Rule 12(b)(6).  In order to state a claim upon which relief can be granted under Rule 12(b)(6), a plaintiff need only provide a "short and plain statement" of his claim indicating why he is entitled to relief.  See Fed. R. Civ. P. 8; Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  On the other hand, in order to establish the first factor of injunctive relief, a plaintiff must provide the Court with "sufficient evidence" to satisfy the essential elements of his underlying claims.  See Punnett, 621 F.2d at 582-83.  Thus, the standard for obtaining injunctive relief is considerably higher than the standard for surviving dismissal.  Therefore, if a plaintiff cannot satisfy the more lax standards governing

dismissal, he likewise cannot satisfy the considerably higher standard for injunctive relief.  Stated differently, if a claim survives dismissal, it may also be sufficient for injunctive relief purposes.  If the same claim does not survive dismissal, however, it likewise will not suffice to establish a likelihood of success on the merits for purposes of injunctive relief.

The instant situation falls within the latter of these two categories.  In its above Discussion, the Court found that Plaintiff's misappropriation claim in Count 19 should be dismissed.  Thus, given that Plaintiff's misappropriation claim does not meet the threshold necessary to evade dismissal; it likewise will not meet the higher standard of establishing a likelihood of success on the merits for injunctive relief purposes.  Accordingly, it appears as though Plaintiff cannot satisfy the first factor of injunctive relief.

The Court notes, however, that in the conclusory paragraph of his Cross-Motion, Plaintiff for the first time raises the Uniform Fraudulent Transfer Act, N.J.S.A. § 25:2-20, et seq. — rather than misappropriation — as the basis of his requested injunctive relief.  Plaintiff's argument in his Cross-Motion is entirely different than the basis for injunctive relief that he initially asserted in Count 19 of his Complaint.  Indeed, the Court need look no further than the contents of the Complaint to

see this difference.  The clearly bolded and capitalized title
of Count 19 — the count requesting an injunction — is
"Misappropriation of Assets, Trade Secrets, Proprietary
Information and Other Assets."  At no point in this count does
Plaintiff make any reference to UFTA.  More so, in Count 4 — the
count brought pursuant to UFTA — Plaintiff did not request an
injunction and only seeks monetary damages.  Despite being free
to do so, Plaintiff did not seek leave to amend his Complaint to
change the basis of his sought injunction to include claims
based upon UFTA.  Instead, Plaintiff by his own prerogative
filed the instant Cross-Motion for Imposition of Prejudgment
Temporary Restraints Against Defendants.  It appears that, upon
discovering that he was unlikely to prevail on the merits of his
misappropriation claim, Plaintiff switched the underlying basis
for his injunctive relief claim to UFTA because he was more
likely to prevail on the merits of such a claim.  Plaintiff's
own Motion, however, fails to show how he is likely to do so.
More specifically, in the final paragraph, Plaintiff recites
portions of § 25:2-29(a), and then conclusively alleges that:
"The Complaint contains counts brought under the New Jersey
Fraudulent Transfer Act. . . . [Section] 2-29a [] provides the
requisite statutory and equitable 'hook' for this Court to enter
the restraints against the Insider Defendants to prevent further
transfer and dissipation of assets pending the completion of

132

this case." (Pl.'s Cross-Mot. at 23.)  Plaintiff does not,
however, explain why this statutory section serves as the
requisite "hook" for injunctive relief, nor does he provide the
Court with "sufficient evidence" to satisfy the essential
elements of an underlying cause of action based on UFTA.  See
Punnett, 621 F.2d at 582-83.  Instead, Plaintiff summarily
states that "as to reasonable probability of success on the
merits, a prima facie case against the Defendants has been set
forth in the Complaint; it need not be proven here and now."
(Pl.'s Cross-Mot. at 20.)  The Third Circuit has previously
recognized that "passing reference" to an issue in a brief is
insufficient to put the opposing party on notice that relief is
requested as to that particular issue.  See Laborers Int'l Union
v. Foster Wheeler Energy, 26 F.3d 375, 398 (3d Cir. 1994)
(quoting Simmons v. City of Phila., 947 F.2d 1042, 1066 (3d Cir.
1991)).  Thus, Plaintiff's cursory reference to UFTA in the very
last paragraph of his brief supporting his Cross-Motion is
insufficient for purposes of obtaining the "extraordinary
remedy" of injunctive relief.  See Nat'l Steel Car, 357 F.3d at
1324.

    Plaintiff perhaps attempted to clarify his argument in his
Reply brief, where he for the first time specifically cites UFTA
§ 25:2-25 as the basis for his requested injunction.  However,

it is well established that new arguments cannot be raised for the first time in reply briefs.[53]  See Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F.Supp. 447, 458 (D.N.J. 1998).  As such, Plaintiff was precluded from asserting a new basis for injunctive relief in his Reply brief.

Furthermore, the Court notes that this is the second time Plaintiff has faced an attack on the relief he seeks with respect to Count 19.  In the above-discussed Motion to Dismiss, Defendants argued that Plaintiff did not satisfy the elements of misappropriation.  Plaintiff's Response in Opposition on this point, however, made no reference to UFTA.  This further indicates to the Court that Plaintiff has raised a new argument at too late a stage of proceedings.

Therefore, regardless of whether the underlying cause of action for Plaintiff's sought injunction is based on misappropriation or New Jersey's UFTA statute, Plaintiff has failed to show that he is reasonably likely to succeed on the

_____

[53]    The rationale for this rule is self-evident: since the Local Rules do not permit sur-reply briefs, see L.Civ.R. 7.1(d), an opposing party would not have the opportunity to respond to newly-minted arguments in reply briefs.  See Santiago v. City of Vineland, 107 F.Supp.2d 512, 553 (D.N.J. 2000).

merits of his underlying claims.  Accordingly, he cannot fulfill the first prerequisite necessary to obtain an injunction.[54]

---

[54]    Although not entirely clear from Plaintiff's submissions, it appears as though he likewise requests the Court to award him a prejudgment attachment.  In its simplest form, a prejudgment attachment allows a creditor to levy a security interest on the debtor's property in an effort to secure his claim against the debtor in the event that a judgment should be entered.  See ABC Sewer Cleaning Co. v. Foxco, Inc., No.Civ.A.90-1934, 1990 U.S. Dist. LEXIS 12571, at *1 (E.D. Pa. Sept. 21, 1990).  The general rule followed by courts is that a judgment establishing a debt is necessary prior to interfering with a debtor's use of his property.  See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999).  On this point, the Supreme Court has stated that: "The rule requiring a judgment was a product, not just of the procedural requirement that remedies at law had to be exhausted before equitable remedies could be pursued, but also of the substantive rule that a general creditor (one without a judgment) had no cognizable interest . . . in the property of his debtor, and therefore could not interfere with the debtor's use of that property."  Id. at 331.

Here, Plaintiff claims that the Supreme Court's decision in Grupo Mexicano authorizes a creditor to circumvent the above-described general rule in cases involving UFTA, and that he therefore need not obtain a judgment prior to asserting claims regarding the Debtor's assets.  Grupo Mexicano did not, however, so hold.  In that case, the Supreme Court actually upheld the general rule that the establishment of a judgment was necessary prior to meddling in a debtor's affairs.  Id. at 321-24 ("[We] follow the well-established general rule that a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property.").  In a footnote, the Court noted that UFTA could potentially alter the underpinnings of the general rule requiring prior obtainment of a judgment.  Id. at 324 n.7.  However, because Grupo Mexicano did not involve a fraudulent conveyance claim, the Supreme Court expressed no opinion on UFTA's potential effect on the applicability of the general rule in such matters.  Id. ("Because this case does not involve a claim of fraudulent conveyance, we express no opinion on the point.").  As such, Plaintiff cannot rely on Grupo Mexicano to support his argument.

**B.    Irreparable Harm**

In deciding whether preliminary relief should be granted, the second factor a court must consider is the extent to which the plaintiff would suffer irreparable injury if preliminary relief were denied.  The Third Circuit has indicated that:

> In order to demonstrate irreparable harm[,] the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm. Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a "clear showing of *immediate* irreparable injury." The requisite feared injury or harm must be *irreparable* — not merely

Further, Plaintiff also relies on N.J.S.A. § 25:2-29(a) as the basis for his prejudgment attachment claim.  As pointed out by Defendants, that statute requires compliance with Rule 4:60 of the Rules Governing the Courts of the State of New Jersey. See N.J.S.A. § 25:2-29(a)(2) ("In an action for relief against a transfer or obligation under this article, a creditor . . . may obtain . . . [a]n attachment or other provisional remedy against the asset transferred . . . in accordance with . . . Rule 4:60 et seq. of the Rules Governing the Courts of the State of New Jersey[.]").  Rule 4:60 states that a party's motion for issuance of a writ for prejudgment interest shall be granted:

> only upon the court's finding, based on the moving papers, any opposing affidavits which may have been filed, and any testimony taken . . . that (1) there is a probability that final judgment will be rendered in favor of the plaintiff; (2) there are statutory grounds for issuance of the writ; and (3) there is real or personal property of the defendant at a specific location within this State which is subject to attachment.

N.J.R. 4:6-5. Here, the Court has determined that Plaintiff cannot at this time establish that final judgment will be rendered in his favor.  As such, Plaintiff's request for prejudgment attachment likewise fails for this reason.

136

> serious or substantial, and it must be of a peculiar
> nature, so that compensation in money cannot atone for
> it.

Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir.

1992) (internal citations & quotations omitted) (emphasis

added).  In short, if a plaintiff can be made whole through

monetary damages, injunctive relief is inappropriate.

Jurista asserts that the irreparable injury "which

creditors would suffer if the Defendants were permitted to

transfer their assets to third parties is obvious; it would

require Plaintiff to keep chasing subsequent transferees of the

fraudulently transferred assets, frustrating ultimate collection

by Plaintiff."  (Pl.'s Cross-Mot. at 20.)  However, this alleged

injury is not immediate, irreparable, or of a peculiar nature.

In fact, it actually appears to be rather speculative, as

Plaintiff does not substantiate his allegations that Defendants

will continue to shift the already transferred assets with any

factual basis.  Even more importantly, Plaintiff's primary

claims against Defendants are that they received monetary

benefits at Jermax's expense, fraudulently transferred equipment

from Jermax to Amerinox for less than market value, failed to

make payments or repay loans that they owed to the Debtor, and

unlawfully declared dividends to themselves when Jermax was

otherwise insolvent.  (Compl. ¶¶ 20-36.)  It thus appears that

Plaintiff's claims are solely economic in nature.  He therefore

137

can be made whole through monetary damages, and injunctive
relief is inappropriate under these circumstances.  Accordingly,
Plaintiff has likewise failed to satisfy the second element of
injunctive relief.[55]

---

[55]    In this section of his Cross-Motion, Plaintiff also off-
handedly requests the Court's permission to file *lis pendens*
upon any and all real property owned by the Insider Defendants.
"Ordinarily *lis pendens* are filed when plaintiff asserts an
interest in or a claim upon specific real property." Cole,
Schotz, Bernstein, Meisel & Forman, P.A. v. Owens, 679 A.2d 155,
159 (N.J. Super. 1996) (citing Polk v. Schwartz, 399 A.2d 1001
(N.J. Super. 1979)).  New Jersey's statute authorizing *lis
pendens* provides as follows:

> In every action, instituted in any court of this State
> having civil jurisdiction or in the United States
> District Court for the District of New Jersey, the
> object of which is to enforce a lien upon real estate
> or to affect the title to real estate or a lien or
> encumbrance thereon, plaintiff or his attorney shall,
> after the filing of the complaint, file in the office
> of the county clerk or register of deeds and
> mortgages, as the case may be, of the county in which
> the affected real estate is situated, a written notice
> of the pendency of the action, which shall set forth
> the title and the general object thereof, with a
> description of the affected real estate.

N.J.S.A. § 2A:15-6.  The statute goes on to explicitly state
that "[n]o notice of *lis pendens* shall be filed under this
article in an action to recover a judgment for money damages
only." Id.  As indicated above, the instant dispute is solely
based on an economic injury seeking monetary recovery. See
Owens, 679 A.2d at 159 (finding that *lis pendens* statute did not
apply to action for attorneys' fees because this constituted
monetary recovery).  Furthermore, Plaintiff does not identify —
as the statute requires — the "title, general objects, or
descriptions of real estate" that he wishes to file *lis pendes*
upon.  As such, given Plaintiff's failure to adhere to the
requisite rules, the request to file *lis pendens* upon

C.    **Balance of the Equities**

The third factor the Court must consider before granting injunctive relief is the harm Defendants might suffer if an injunction is entered.  "In considering this harm, the district court must undertake to balance the hardships to the respective parties.  The court must ensure that the issuance of an injunction would not harm the infringer more" than the infringed-upon party.  Pappan Enter., Inc. v. Hardee's Food Sys., 143 F.3d 800, 805 (3d Cir. 1998).

Here, Plaintiff avers that Defendants would suffer no harm from the entry of an injunction, or at least comparatively less harm than Jermax's creditors continue to suffer.  (Pl.'s Cross-Mot. at 20.)  Plaintiff asserts that, at a minimum, the entry of an injunction is necessary to preserve the status quo pending the course of litigation. (Id.)  Plaintiff has not, however, clearly articulated to the Court how Jermax's creditors continue to be irreparably harmed by these allegedly fraudulent transfers such that entry of an injunction is immediately necessary here.

Further, the Court notes that Plaintiff requests an injunction which would enjoin Defendants "from having any further contact with the Debtor's accounts and customers" and "from utilizing any of the Debtor's assets."  (Compl. ¶¶ 179(1)-

Defendants' real property pending the course of this litigation is denied.

(2).)  But Plaintiff has failed to explain to the Court how Defendants continue to have any contact with Jermax's accounts, customers, or assets.  Indeed, upon filing its bankruptcy petition, Jermax entered the realm of bankruptcy, and the Bankruptcy Court assumed management of its accounts, customers, and assets — not any of the Defendants.  As such, the Court is at a loss to see how Jermax continues to be injured in this way such that injunctive relief is necessary.

Moreover, contrary to Plaintiff's assertions, the Court believes that Defendants are likely to suffer at least some degree of harm here.  Specifically, if granted in its sought form, the injunction would require Defendants to return and discontinue use of any assets transferred from Jermax to Amerinox.  It remains unclear at this point in time, however, whether the transfer of these assets was actually fraudulent. If the Court eventually determines that these asset transfers were fraudulent, then they can be avoided under the Code and all property or its equivalent value returned to the Debtor's estate.  In contrast, if the Court were to presently award Plaintiff his sought injunctive relief and it is subsequently determined that the transfers were not fraudulent, Defendants' preclusion from using these assets during this time will have

harmed their business.[56]  Accordingly, the Court finds that
Plaintiff has likewise not satisfied the third element of
injunctive relief.

    **D.**    **The Public Interest**

    The final factor the Court must consider is whether
issuance of an injunction would be in the public's interest.  A
plaintiff's success in establishing harm to the public interest
is intricately tied to its establishment of the other three
necessary elements of injunctive relief. See <u>Winter v. Nat. Res.
Def. Council, Inc.</u>, 555 U.S. 7, 26-27 (2008).

    On this point, Plaintiff argues that entry of an injunction
would "send[] a message that fraudulent transferees will not
avoid their day of reckoning by continuing to engage in the
wrongful conduct that would further defraud creditors." (Pl.'s
Cross-Mot. at 20.)  It is true that New Jersey has a legitimate
interest in preventing fraud and ethically questionable conduct
by its businesses.  See <u>A.S. Goldmen & Co. v. N.J. Bureau of
Sec.</u>, 163 F.3d 780, 788 (3d Cir. 1999).  It remains to be seen,
however, whether or not Defendants' conduct here was actually

---

[56]    Indeed, the injunction seeks to restrain Defendants from
using _any_ of the assets previously transferred from Jermax to
Amerinox.  It is unclear from this very broad language whether
this could potentially apply to other property that was
previously lawfully transferred between the two companies.

fraudulent or improper.  Accordingly, entry of injunctive relief
on this basis alone would be improper.

    **E.**    **The Bond Requirement**

    Finally, the Court pauses to comment on Plaintiff's failure
to even acknowledge that a party seeking an injunction is
required by Federal Rule of Civil Procedure 65(c) to post a
security bond.  See Fed. R. Civ. P. 65(c) ("The court may issue
a preliminary injunction or a temporary restraining order only
if the movant gives security in an amount that the court
considers proper to pay the costs and damages sustained by any
party found to have been wrongfully enjoined or restrained.").
It has previously been recognized that the Third Circuit
"strictly interprets" the bond requirement of Rule 65(c).
Scanvec Amiable Ltd. v. Chang, No.Civ.A.02-6950, 2002 U.S. Dist.
LEXIS 22261, at *6 (E.D. Pa. Nov. 4, 2002)(citing Elliott v.
Kiesewetter, 98 F.3d 47, 59 (3d Cir. 1996); Hoxworth v. Blinder,
Robinson & Co., Inc., 903 F.2d 186, 210 (3d Cir. 1990)).  The
purpose of the bond security is to maintain the status quo and
protect the opposing party from incurring costs and damages in
the event that the stay is wrongfully imposed.  See Scanvec, 2002
U.S. Dist. LEXIS 22261 at *7 ("A party injured by the issuance
of an injunction later determined to be erroneous has no action
for damages in the absence of a bond[.]") (internal citations

142

omitted).  Indeed, "the bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction."  Edgar v. MITE Corp., 457 U.S. 624, 649 (1982) (Stevens, J., concurring).

In cases such as the instant bankruptcy reorganization, the quantifiable costs and potential damages could be considerably high.  See In re W.R. Grace & Co., -- B.R. --, No.Civ.A.11-199, 2012 U.S. Dist. LEXIS 88887, at *22 (D. Del. June 27, 2012) (stating that the quantifiable costs of a stay in a mass tort debtor's bankruptcy reorganization case could range from $77 to $107 million dollars, depending on the length of time that the stay remained in place).  Indeed, it has previously been recognized that, "in commercial actions, 'when setting the amount of security, district courts should err on the high side.'"  See Scanvec, 2002 U.S. Dist. LEXIS 22261 at *11 (quoting Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000)).  Although the determination of the precise bond amount is within the district court's discretion, courts often look to the parties' submissions in ascertaining such an amount.  Scanvec, 2002 U.S. Dist. LEXIS 22261 at *1 (referencing court's earlier order).

Here, Plaintiff fails to even acknowledge the bond requirement, let alone provide an estimate of the amount of such

143

a bond.  Therefore, rather than engage in an extensive analysis
of the bond requirement, the Court merely considers Plaintiff's
failure to acknowledge this point as another factor weighing
against the imposition of an injunction under these
circumstances.  See W.R. Grace, 2012 U.S. Dist. LEXIS 88887 at
*24 (finding appellant's failure to address bond requirement in
bankruptcy reorganization case as another factor counseling
against the imposition of a stay).

Given that Plaintiff has not produced sufficient evidence
on all four factors, coupled with his failure to acknowledge the
necessity of a bond under such circumstances, the Court will not
enter an injunction.  As such, Plaintiff's Cross-Motion for
Prejudgment Temporary Restraints will be denied.

**V.    CONCLUSION**

For the reasons set forth above, the Court finds that the
Motion to Strike of Defendants Amerinox, Gerwitz, Young, and
Carter will be denied.  The Motion to Dismiss filed by these
Defendants, however, will be granted in part and denied in part,
as set forth in the Order accompanying this Opinion.  The Court
further finds that Plaintiff Jurista's Cross-Motion for
Imposition of Prejudgment Restraints will be denied.  Finally,
the Court finds that Defendant GE's Motion to Dismiss will be

granted in part and denied in part, as more fully set forth in
the Order adjoining this Opinion.

     An appropriate Order follows.


                                        _/s/ Noel L. Hillman_____
At Camden, New Jersey                   NOEL L. HILLMAN, U.S.D.J.

DATED:   __03/28/13_____